[**Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *State v. Neyland,* **Slip Opinion No. 2014-Ohio-1914.**]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2014-OHIO-1914

THE STATE OF OHIO, APPELLEE, *v.* NEYLAND, APPELLANT.

[**Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *State v. Neyland,* **Slip Opinion No. 2014-Ohio-1914.**]

*Criminal law—Aggravated murder—Death penalty affirmed.*

(No. 2008-2370—Submitted August 20, 2013—Decided May 8, 2014.)

APPEAL from the Court of Common Pleas of Wood County,

No. 2007-CR-0359.

_____

**KENNEDY, J.**

{¶ 1} This is an appeal as of right by defendant-appellant, Calvin Neyland Jr. A jury convicted him of the aggravated murders of Douglas Smith and Thomas Lazar, and it recommended the sentence of death on each count of murder. The trial court accepted those recommendations and sentenced Neyland accordingly.

## I. Trial Evidence

### A. *State's case*

{¶ 2} Evidence introduced at trial showed that Neyland began working as a truck driver for Liberty Transportation Company in Perrysburg, Ohio, in July 2006.

{¶ 3} Beginning in March 2007, Neyland was cited several times for falsifying his driver's logs and for committing other driving violations. On July 24, 2007, Liberty notified Neyland in writing of these infractions and informed him that any further violations for completing a false document would result in his termination from the company.

{¶ 4} Doug Smith was the branch manager for Liberty Transportation in Perrysburg. During the spring of 2007, Smith noticed a change in Neyland's attitude and performance. Smith was receiving complaints from Liberty's customers about Neyland, and some of them did not want Neyland to return to their businesses. Neyland and Smith had a meeting about one of the complaints. The meeting resulted in a bizarre ending with Neyland seated in a lawn chair outside Smith's office, repeatedly phoning him, while Smith remained in his office with the doors locked.

{¶ 5} During late July or early August 2007, Anthony Arent, the shipping manager at nearby Great Lakes Windows, overheard Neyland on the phone with Smith. Arent testified that Neyland was "very uncooperative" during the conversation and that he resorted to profanity, calling Smith "a bitch." William Lynch Jr., a truck driver for Liberty, talked to Neyland about a week before the murders. Neyland, who was upset with Smith, warned, "If they mess with me, I'll just shoot them."

{¶ 6} On August 1, 2007, Neyland was involved in a vehicle accident and was determined to be at fault. Following this incident, officials at Liberty decided to terminate Neyland's employment.

{¶ 7} Smith scheduled a meeting with Neyland at Smith's office at 8:00 a.m. on August 8, 2007, to terminate Neyland's employment. Thomas Lazar, the safety director for Liberty, planned to attend this meeting because Smith did not want to be alone with Neyland when he terminated him. Lazar also planned to

remove the Department of Transportation ("DOT") sticker that was attached to the door of Neyland's tractor-trailer.

{¶ 8} On August 8, Neyland delayed the meeting three times before he finally agreed to meet with Smith and Lazar at 3:00 p.m. During one conversation to reschedule the meeting, Neyland told Smith that if Smith was going to have somebody at the meeting, then he was going to bring somebody, too.

{¶ 9} At approximately 3:00 p.m., Neyland arrived outside Liberty's warehouse in his tractor. Neyland was wearing a dark Hawaiian shirt. It is unclear whether Neyland met with either Lazar or Smith when he first arrived. In any event, Neyland shot Lazar four times in the back and once in the arm in the yard outside the building. Neyland then entered Liberty's warehouse with a gun in his hand and walked up the stairway to Smith's office.

{¶ 10} Smith called 9-1-1 and reported that he heard shots being fired. He told the 9-1-1 operator that he needed to get downstairs to see what was going on. On the recording of the call, two gunshots can be heard and a voice says, "crawl bitch." There is then the sound of a struggle, and Smith repeatedly calls for help. A final shot was then fired. Neyland had killed Smith in his office with a single gunshot to the head.

{¶ 11} Afterwards, Neyland left the warehouse with the gun in his hand. He walked to his tractor and drove away.

{¶ 12} Police officers arriving at the scene found Lazar lying on the lawn in front of Liberty's warehouse. He died at the scene shortly thereafter. Officers also went upstairs and found Smith's dead body lying on the floor near his desk. A description of Neyland's tractor, along with a partial license-plate number, was broadcast to law-enforcement agencies.

{¶ 13} Investigators collected shell casings outside the warehouse and around Smith's office. They found one bullet hole that went through Smith's

chair and into the wall and another bullet hole in the wall behind the chair. Investigators also found paperwork about Neyland's performance, including a driver's vehicle-inspection report, in the middle of the desk.

{¶ 14} After the shooting, Neyland drove to the Silver Blue Motel in Monroe County, Michigan, where he was staying. During the late afternoon of August 8, 2007, police officers spotted Neyland's tractor parked outside the motel. Officers watched the tractor until the Monroe County Special Weapons and Tactics (SWAT") team arrived.

{¶ 15} Around 6:00 p.m., Neyland came out of his motel room, got into the tractor, and drove the short distance to the motel office. The SWAT team then approached the vehicle and arrested Neyland. As he was being placed on the ground, Neyland said, "I was going to turn myself in." Neyland also said, "I want the letter. There's a letter in my truck. It's to my brother. It's my last will." When asked if he had any weapons before being handcuffed, Neyland said, "No, the gun is in the truck by the door."

{¶ 16} Neyland was placed in a police cruiser following his arrest. Sgt. Keith Williamson of the Ohio Bureau of Criminal Identification and Investigation ("BCI&I") Crime Scene Unit, obtained a gunshot-residue sample from Neyland's hands.

{¶ 17} After obtaining a search warrant, the police seized evidence from Neyland's tractor. A Ruger 9 mm handgun and magazine inside a holster, another weapon magazine, and a dark Hawaiian shirt were found between the driver's and the passenger's seats. Sgt. Williamson also obtained a gunshot-residue sample from the steering wheel.

{¶ 18} During the search of the tractor, the police collected an envelope addressed to Phyllis Gregory with Neyland's return address. Inside the envelope were three default-payment notices that had been sent to Neyland for four storage units. On each of the notices, Neyland had handwritten some variation of the

following statement: "This may be my last will and testament. You may have these items. I will no longer be able to pay; these are paid til 8/1/07." Two of the statements were signed by Neyland. On the reverse side of one notice, Neyland wrote that additional items were located at the Silver Blue Motel. Beneath this last statement, Neyland wrote an address next to his brother's name.

{¶ 19} Dr. Cynthia Beisser, M.D., deputy coroner for Lucas County, conducted the autopsies on Smith and Lazar. Dr. Beisser testified that Smith died from one gunshot wound to the head. The gunshot entered Smith's right cheek and exited just above his left ear.

{¶ 20} Dr. Beisser testified that Lazar was shot four times in the back and once in the right arm. Three of the shots in the back were in close proximity and displayed a triangular pattern. Gunpowder stippling around one of the gunshot wounds in the back indicated "an intermediate range of fire." Dr. Beisser concluded that Lazar's death resulted from multiple gunshot wounds.

{¶ 21} After obtaining a search warrant, the police searched Neyland's storage units. In one of the units, the police found two spotting scopes set up in the middle of the unit with pieces of paper underneath. The top piece of paper stated, "If your big dumb retard ass wasn't in here!!! You wouldn't be reading this would you?" A paper underneath that one stated, "OOOO, I'm so scared. Three Round Shot Group." On the same paper, three pennies were arranged in a triangular pattern with circles drawn around them. Below the pennies, there was the statement, "You think I'm playing[.] You're gonna come up missing!!!" Numerous firearms and ammunition were also found in the storage unit.

{¶ 22} Daniel Davison, a forensic scientist at BCI&I, performed a gunshot-residue analysis on samples from Neyland's hands and from the steering wheel of the tractor. Davison testified that test results were "highly indicative of gunshot residue" on one of the samples from Neyland's hands and on a sample from the steering wheel.

**{¶ 23}** Todd Wharton, a forensic scientist at BCI&I, compared Neyland's fingerprints with a fingerprint lifted from a weapons magazine found in Neyland's tractor. Wharton testified that his comparison identified the print of Neyland's left little finger on the magazine.

**{¶ 24}** Wharton also examined the Ruger 9 mm semiautomatic pistol found in Neyland's tractor. Testing established that the empty cartridge cases collected at the murder scene were fired from this firearm. Testing also confirmed that bullets recovered from the scene and from the Lazar autopsy had been fired by this firearm.

### B. *Defense case*

**{¶ 25}** The defense presented no witnesses during the trial phase. The defense did present four sales receipts showing that two rifles, a shotgun, and a pistol found in Neyland's storage unit had been purchased on November 3, 2006. Defense counsel offered this evidence to show that these weapons were purchased almost ten months before the homicides.

### II. Case History

**{¶ 26}** Neyland was indicted on two counts of aggravated murder pursuant to R.C. 2903.01(A). Count One charged Neyland with the aggravated murder of Lazar with prior calculation and design. Count Two charged Neyland with the aggravated murder of Smith with prior calculation and design.

**{¶ 27}** Counts One and Two included death-penalty specifications for purposeful killings as part of a course of conduct, R.C. 2929.04(A)(5). Count Two included a death-penalty specification for murder to escape accounting for a crime, R.C. 2929.04(A)(3). Both counts also included gun specifications.

**{¶ 28}** Neyland pleaded not guilty to all charges. The jury found Neyland guilty of all charges and specifications, except he was found not guilty of the specification for murder to escape accounting for a crime. Neyland was

sentenced to death on the two counts of aggravated murder. He was also sentenced to six years in prison for the two gun specifications.

### III. Issues on Appeal

{¶ 29} The principal issues for review include Neyland's competency to stand trial, the trial court's order that Neyland wear leg restraints in the courtroom, the introduction of weapons and ammunition not used in the murders, the introduction of Dr. Smith's former testimony during the penalty phase, and the adequacy of the trial court's sentencing opinion.

{¶ 30} In this appeal, Neyland seeks reversal of his convictions and sentence in 19 propositions of law. We will address the issues in the approximate order that they arose during the trial proceedings.

A. *Pretrial and trial-phase issues*

1. *Competency to stand trial* (Proposition of law I)

{¶ 31} Neyland argues that the trial court abused its discretion in finding that he was competent to stand trial, because this ruling is not supported by the evidence.

{¶ 32} The test for determining whether a defendant is competent to stand trial is " ' "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." ' " *State v. Berry*, 72 Ohio St.3d 354, 359, 650 N.E.2d 433 (1995), quoting *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960), quoting the argument of then Solicitor General J. Lee Rankin. Moreover, a defendant is presumed to be competent to stand trial, and the burden is on the defendant to prove by a preponderance of the evidence that he is not competent. *State v. Jordan*, 101 Ohio St.3d 216, 2004-Ohio-783, 804 N.E.2d 1, ¶ 28; R.C. 2945.37(G).

**{¶ 33}** A trial court's finding that a defendant is competent to stand trial will not be disturbed where there is some reliable and credible evidence supporting that finding. *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 46; *State v. Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, ¶ 33.

a. The competency proceedings

**{¶ 34}** Defense counsel submitted a pretrial motion requesting that Neyland be examined to determine whether he was competent to stand trial. Dr. Thomas G. Sherman, a psychiatrist at the Court Diagnostic and Treatment Center, met with Neyland and concluded that he was not competent to stand trial.

**{¶ 35}** The trial court granted the state's request for a second evaluation of Neyland's competency to be conducted on an in-patient basis at Twin Valley Behavioral Healthcare. Dr. Delaney Smith, a psychiatrist at Twin Valley, and Dr. Kristen E. Haskins, a clinical psychologist at Twin Valley, evaluated Neyland. They found that Neyland was competent to stand trial. The trial court then granted a defense request for a third evaluation. Dr. Barbra A. Bergman, a clinical/forensic psychologist, conducted this evaluation and concluded that Neyland was competent.

**{¶ 36}** Thereafter, the trial court conducted a competency hearing. Dr. Sherman testified that he spent a little over an hour talking with Neyland and determined that he had a mental illness, most likely schizophrenia. Dr. Sherman mentioned that Neyland had been evaluated in the late 1990s, and it was determined that he had a mental illness then. Dr. Sherman provided examples of Neyland's paranoid thinking. Neyland believed that people were placing prophylactics in his laundry and that people were entering his apartment and listening to his answering machine.

**{¶ 37}** Dr. Sherman stated that as a result of his mental illness, Neyland was "not able to understand the nature or the gravity of the charges against him,

but more importantly it impacted upon his ability to cooperate with his own defense." Dr. Sherman concluded that Neyland was not competent to stand trial. He stated, "This was not even a close call." During cross-examination, Dr. Sherman acknowledged that he did not speak with Neyland's attorneys, did not administer any tests, and did not review the reports completed by the other psychologists who had examined Neyland.

**{¶ 38}** Dr. Smith testified that Neyland was "under my care" during his 30-day in-patient stay at Twin Valley. Dr. Smith was responsible for doing "intake on him, a psychiatric assessment, and prescribing any medications." Dr. Smith detected no signs of mental illness, but determined that Neyland had a paranoid personality disorder. She stated that Neyland discussed his plans to work with his attorneys and mentioned that if things did not work out at trial he could file an appeal. Dr. Smith also testified that "he was able to be cooperative when he chose to be so; and that when he chose not to be cooperative it was just that, it was a choice that he was making and not the product of some mental illness, such as being grossly delusional * * * or hearing voices telling him not to cooperate." Dr. Smith concluded, "It is my opinion within a reasonable medical certainty that he is both able to understand the nature and objectives of the proceedings as well as to assist counsel in his defense should he choose to do so." Yet Dr. Smith did not complete a written report and acknowledged that it was not her purpose to conduct a competency evaluation.

**{¶ 39}** Dr. Haskins also evaluated Neyland during his stay at Twin Valley. She administered a test called the MacArthur Competence Assessment Tool-Criminal Adjudication ("MacCAT-CA") to help determine Neyland's competency. Neyland had a low score of 4 out of a possible 16 on the reasoning section, suggesting serious difficulty in distinguishing relevant from irrelevant information and difficulty in reasoning about the options of pleading guilty or not

guilty. Dr. Haskins attributed this low score to Neyland's refusal to cooperate with the assessment procedures.

{¶ 40} But Dr. Haskins's clinical evaluation showed that Neyland was aware of the charges against him, knew the possible pleas and the potential sentences, and understood the different roles of the parties. Neyland also stated that he would allow his attorneys to defend him. Dr. Haskins testified that Neyland is "at least of average intelligence" and that he does not have a serious mental illness. She concluded that Neyland is "capable of understanding the nature and objective of the proceedings against him and of assisting in his own defense." Yet Dr. Haskins said that "it's going to be very difficult for his attorneys to represent him. He is not stupid. * * * He has certain thoughts about how he wants things to go."

{¶ 41} Dr. Bergman evaluated Neyland during a one-hour interview at the Wood County Jail. She testified that Neyland did not want her to conduct this evaluation, because a competency evaluation had already found that he was competent. She stated that Neyland was "very controlling" and would not allow her to ask questions about pertinent topics. Dr. Bergman believed that Neyland had a personality disorder with predominant features that are paranoid, narcissistic, schizoid, and obsessive-compulsive. Dr. Bergman concluded that Neyland understood the nature and significance of the charges and the objectives of the court proceedings and that he was capable of assisting his counsel and meaningfully participating in the proceedings.

{¶ 42} The trial court found Neyland competent to stand trial. The trial court stated that Dr. Smith and Dr. Haskins were more persuasive than Dr. Sherman, because the doctors at Twin Valley had the opportunity to observe Neyland's behavior for approximately 30 days. The trial court discounted Neyland's low score on the reasoning section of the MacCAT-CA because all the doctors who evaluated Neyland indicated that he was very guarded and that

Neyland exercised his right against self-incrimination, which made it difficult to administer the test.

b. Analysis

{¶ 43} Neyland argues that the trial court abused its discretion in finding that he was competent to stand trial. He asserts that Dr. Sherman's report, along with his experience, deserved as much weight, if not more, than the other expert opinions. Neyland also attacks the findings of the three experts who found him to be competent and argues that the trial court erred in relying on their testimony in finding him competent.

{¶ 44} First, Neyland argues that Dr. Haskins's opinion that he was competent was not supported by her own underlying findings about Neyland, including (1) his inability to disclose personal information, (2) his rigid neurotic adjustment, (3) his clinically significant impairment and serious difficulty in distinguishing relevant from less relevant factual information and in reasoning about legal options of pleading guilty or not guilty, and (4) the likelihood that he would be a very difficult defendant with whom to reason.

{¶ 45} Neyland's claims take Dr. Haskins's statements out of context. Dr. Haskins acknowledged that the validity of Neyland's test results on the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2") might have been compromised by his unwillingness or inability to disclose personal information. Dr. Haskins also discussed the possibility that Neyland's pattern of uncooperativeness may be due to a "rigid neurotic adjustment."

{¶ 46} Dr. Haskins did report that Neyland scored low on the reasoning section of the MacCAT-CA. But Dr. Haskins attributed Neyland's low score to his refusal to cooperate with the assessment procedures. Dr. Haskins's comment that Neyland will be a "very difficult defendant with whom to reason" came after her discussion about Neyland's refusal to cooperate and refusal to answer certain questions on the MacCAT-CA. Dr. Haskins's observations do not conflict with

her finding that Neyland is competent to stand trial. As noted in *Berry*, 72 Ohio St.3d at 360-361, 650 N.E.2d 433, a defendant's failure to cooperate with counsel does not constitute sufficient indicia of incompetence to raise doubt about a defendant's competence to stand trial. Thus, Dr. Haskins's findings do not undermine her competency findings.

{¶ 47} Second, Neyland argues that Dr. Bergman's opinion that he was competent to stand trial is undermined by her observations of Neyland's (1) poor judgment, (2) inflexible, rigid views, (3) limited insight, (4) severe personality disorder, and (5) failure to assist his counsel to prepare for his defense.

{¶ 48} Dr. Bergman discussed Neyland's mental status in her written evaluation. Neyland's poor judgment, inflexible, rigid views, and limited insight into his own behavior were some of the factors that led to Dr. Bergman's conclusion that Neyland had a severe personality disorder. These findings do not undermine Dr. Bergman's conclusion that Neyland was competent to stand trial. Indeed, "[i]ncompetency must not be equated with mere mental or emotional instability or even with outright insanity. A defendant may be emotionally disturbed or even psychotic and still be capable of understanding the charges against him and of assisting his counsel." *State v. Bock*, 28 Ohio St.3d 108, 110, 502 N.E. 1016 (1986).

{¶ 49} Dr. Bergman's evaluation included her discussion with J. Scott Hicks, Neyland's defense counsel. Hicks reported that Neyland is "no help at all in preparing the case for [the] defense." Dr. Bergman stated that Neyland had his own ideas about his defense and expressed his unhappiness with counsel's direction in managing his case. Yet Neyland clearly understood his legal rights and stated several times, "I have a right to remain silent." Neyland's lack of cooperation with defense counsel at various times did not establish that he was not competent to stand trial. *See Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193,

12

790 N.E.2d 303, at ¶ 30. Thus, Dr. Bergman's comments about Neyland's lack of cooperation with counsel did not invalidate her findings.

{¶ 50} Neyland also argues that Dr. Bergman's finding of competency was based on the wrong standard, i.e., she believed that he must be suffering from mental illness or mental retardation to be found incompetent. We also reject this claim. In finding Neyland competent, Dr. Bergman testified, "In my opinion he does understand the nature and significance of the charges. He does understand the nature and objectives of the Court proceedings. He is capable of assisting his attorney and he is capable of participating in a meaningful manner in the Court proceedings." Thus, Dr. Bergman used the correct standard in finding that Neyland was competent to stand trial.

{¶ 51} Finally, Neyland argues that the trial court's factual findings underlying its determination that he was competent to stand trial were clearly erroneous.

{¶ 52} First, Neyland argues that Dr. Smith's testimony could not form the basis for the trial court's findings, because Dr. Smith testified that it was not her job to perform a competency evaluation and she did not prepare a written report. Thus, Neyland argues that Dr. Smith's testimony did not meet the exacting standards of R.C. 2945.371. However, Neyland failed to object to Dr. Smith's opinion about his competency at the hearing and thus waived all but plain error. *See State v. Mink*, 101 Ohio St.3d 350, 2004-Ohio-1580, 805 N.E.2d 1064, ¶ 29. No plain error occurred.

{¶ 53} R.C. 2945.371 provides procedures for a trial court to follow in conducting competency evaluations. R.C. 2945.371(G)(1) and (2) provide that an examiner shall file a written report that includes the examiner's findings and the facts in reasonable detail on which the findings are based.

{¶ 54} R.C. 2945.37 provides procedures for conducting a competency hearing. R.C. 2945.37(E) states: "The prosecutor and defense counsel *may*

submit evidence on the issue of the defendant's competence to stand trial. A written report of the evaluation of the defendant *may* be admitted into evidence at the hearing * * *." (Emphasis added.) Nothing in R.C. 2945.37 limits expert testimony that may be presented during such hearings.

{¶ 55} Evid.R. 702(B) provides that "a witness may testify as an expert" by reason of his or her "specialized knowledge, skill, experience, training, or education." Dr. Smith was qualified to testify as an expert under Evid.R. 702 because of her specialized knowledge and experience as a psychiatrist. She testified that she had previously conducted between 30 and 40 competency evaluations. Neyland was under Dr. Smith's care during the 30 days that he was at Twin Valley, and she met with him throughout his stay. She also testified that she talked to other staff members who interacted with Neyland on a daily basis.

{¶ 56} We conclude that a sufficient foundation was established for Dr. Smith to render an opinion about Neyland's competency to stand trial. Neyland's complaint that it was not Dr. Smith's job to conduct a competency evaluation goes to the weight to be given to her opinion and not her ability to render such an opinion. *See State v. Luoma*, 2d Dist. Montgomery No. 10719, 1990 WL 197944, *10 (Dec. 7, 1990) (psychiatrist permitted to testify concerning defendant's sanity although his sole purpose for evaluating the defendant was to determine competency).

{¶ 57} Second, Neyland argues that the trial court should not have relied on Dr. Haskins's evaluation, because she spent only four hours with him. Neyland's claim overlooks the fact that Dr. Haskins reported that she received treatment-team updates during Neyland's in-patient stay, talked to defense counsel about him, reviewed treatment charts, reviewed Dr. Sherman's report, consulted with Dr. Smith, and reviewed other information involving his case. Moreover, Dr. Haskins was unable to meet with Neyland for a longer period, because he refused to meet with her.

14

**{¶ 58}** Third, Neyland argues that the trial court erred in finding that because Dr. Smith and Dr. Haskins observed him for approximately 30 days, this gave them a better opportunity to observe his behavior than Dr. Sherman. Neyland emphasizes that Dr. Smith and Dr. Haskins testified that the length of an examination is not the crucial factor in conducting a competency evaluation. Neyland also points out that Dr. Bergman met with him for only an hour.

**{¶ 59}** As with other witnesses, the trial judge heard all of the expert testimony, and it was his job to judge their credibility and weigh all the evidence in making his findings. Deference on these issues should be given to those "who see and hear what goes on in the courtroom." *State v. Cowans*, 87 Ohio St.3d 68, 84, 717 N.E.2d 298 (1999).

**{¶ 60}** The trial court's findings about the length of the evaluations were not unreasonable. Indeed, Dr. Smith compared her examination with Dr. Sherman's shorter examination. She noted, "I had more time to observe and interact with Mr. Neyland and see him in various different settings and see his interactions with different people." Thus, we also reject this claim.

c. Conclusion

**{¶ 61}** We hold that the trial court did not abuse its discretion in finding that Neyland was competent to stand trial. Three of the four witnesses who testified concluded that he was competent. The trial court also reasonably determined that greater weight should be given to testimony of a psychiatrist and a psychologist who examined Neyland during a 30-day observational period rather than a psychiatrist who spent only a little more than an hour with him. Thus, reliable and credible evidence supports the trial court's decision. We reject proposition I.

2. *Request for self-representation* (Proposition of law XIV)

**{¶ 62}** Neyland argues that the trial court erred by failing to grant his request for self-representation.

a. Assertions and request for self-representation

{¶ 63} During a pretrial hearing on December 11, 2007, Neyland told the trial court:

I might be able, I *might have to defend myself* because I am not getting cooperation that I need from the public defender's office.

And my credibility right now, I have 800 pages of prosecution here. I have no, I have nothing for discovery [from] the public defender's office. I have 800 pages from October from the prosecution's office, and I read the 800 pages. There is a credibility problem with every witness in here.

(Emphasis added.)

{¶ 64} In response, the trial court encouraged Neyland to work with his attorneys. The judge stated, "I realize that everyone in your circumstance is nervous about their representation; but in view of the reports that I have received, I would strongly encourage you to not * * * consider that." The trial court's reference to "reports" appears to have been Dr. Sherman's competency evaluation that the parties had been discussing during this hearing. Neyland responded, "My Sixth Amendments Rights have been violated." But Neyland said nothing more about representing himself.

{¶ 65} During a pretrial hearing on February 12, 2008, the trial court expressed concern about the possibility that Neyland would request self-representation. The judge stated, "I'm hoping that he won't raise this * * *. But if at some point he expresses a clear and unequivocal request, then the Court is going to have to rule on it and address it." Adrian Cimerman, lead defense counsel, stated that Neyland had "never seriously, if at all, raised the desire to

represent himself." J. Scott Hicks, assistant defense counsel, also stated, "He has never expressed to me any desire to represent himself."

{¶ 66} During a pretrial hearing on August 25, 2008, the trial court asked defense counsel if Neyland was insisting that counsel withdraw and represent himself. Cimerman replied that Neyland was not.

{¶ 67} On October 30, 2008, following the introduction of all the trial-phase evidence, the trial judge stated that the deputies had informed him that Neyland wanted to discuss representing himself. The trial court stated, "I definitely am not going to let him represent himself pro se at this time because we're done basically other than closing arguments." Nevertheless, the trial court allowed Neyland to make his request.

{¶ 68} Neyland addressed the trial court and made the following remarks about a pro se motion and his request for self-representation:

> Thank you, Your Honor. The first question I need to ask you is I understand that the addendum to Motion 44 was not filed in a timely manner. There is some information from the witnesses that was testified to on the witness stand that is included in the addendum, and I would like to only address that during a presentation. *I would like to mount my own defense from the defense table and counsel with counsel's assistance.* I am not requesting to be a witness. I'm not a witness. I am introducing myself to the jury because they do not have any background information, personal background information, family background information, and I have no defense witnesses.

(Emphasis added.)

**{¶ 69}** Neyland then discussed his concerns about the defense. Neyland claimed that there were discrepancies in witness statements that "I would like to read" and mentioned his desire to read court cases into the record that involved him and his previous employers. Neyland also discussed his unhappiness with counsel because they failed to use his notes during cross-examination.

**{¶ 70}** In response, the trial judge told Neyland that he had noticed that his counsel were paying attention to him when he offered points. The trial court stated, "I'm sure they determined that they just weren't proper issues because you don't understand what is a proper issue before the Court. So, again, I'm going to deny your request to represent yourself." There was no further discussion about self-representation.

b. Analysis

**{¶ 71}** "The Sixth Amendment * * * guarantees that a defendant in a state criminal trial has an independent constitutional right of self-representation and that he may proceed to defend himself without counsel when he voluntarily, and knowingly and intelligently elects to do so." *State v. Gibson*, 45 Ohio St.2d 366, 345 N.E.2d 399 (1976), paragraph one of the syllabus, citing *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). If a trial court denies the right to self-representation when the right has been properly invoked, the denial is per se reversible error. *State v. Reed*, 74 Ohio St.3d 534, 535, 660 N.E.2d 456 (1996), citing *McKaskle v. Wiggins*, 465 U.S. 168, 177, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984), fn. 8.

**{¶ 72}** The assertion of the right to self-representation must be clear and unequivocal. *State v. Dean*, 127 Ohio St.3d 140, 2010-Ohio-5070, 937 N.E.2d 97, ¶ 68; *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3571, 772 N.E.2d 81, ¶ 38. A request for self-representation may be denied when circumstances indicate that the request is made for purposes of delay or manipulation of the trial process. *See United States v. Frazier-El*, 204 F.3d 553, 560 (4th Cir.2000).

**{¶ 73}** First, Neyland argues that the trial court erred in failing to grant his request for self-representation on December 11, 2007. On that occasion, Neyland told the trial court that he "might have to defend himself" at the same time that he was voicing his frustration about getting discovery from the public defender's office. Other courts have held that a request for self-representation is not unequivocal if it is a " 'momentary caprice,' or the result of thinking out loud,' " *Jackson v. Ylst*, 921 F.2d 882, 888 (9th Cir.1990), quoting *Adams v. Carroll,* 845 F.2d 1441, 1445 (9th Cir.1989), or the result of frustration, *Reese v. Nix*, 942 F.2d 1276, 1281 (8th Cir.1991) (defendant merely expressed frustration and did not clearly invoke his right of self-representation). Similarly, we conclude that Neyland was expressing his frustration and not clearly invoking his right to self-representation.

**{¶ 74}** Defense counsel confirmed that Neyland was not invoking his right to self-representation. Counsel told the trial court during a pretrial hearing on February 12, 2008, that Neyland had "never seriously, if at all, raised the desire to represent himself." Thus, we reject Neyland's claim that his request for self-representation on December 11, 2007, was improperly denied.

**{¶ 75}** Second, Neyland argues that the trial court erred in failing to grant his request for self-representation after the state's case-in-chief was completed. Neyland informed the court at that time that "I would like to mount my own defense."

**{¶ 76}** A trial court may deny a defendant's request for self-representation if it is untimely made. In *Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, at ¶ 40, the court held that a defendant's request to represent himself made three days before trial was untimely. Other courts have also found that a request for self-representation can be denied when the request is untimely. *See, e.g.*, *United States v. Young*, 287 F.3d 1352, 1354 (11th Cir.2002) ("a defendant's request to proceed *pro se* is untimely if not made before the jury is empaneled");

*Wood v. Quarterman*, 491 F.3d 196, 202 (5th Cir.2007) ("Wood did not move to proceed *pro se* until *after* the jury had already returned a guilty verdict against him, immediately before the sentencing phase of his [capital-murder] trial, and the trial court therefore had the discretion to deny the motion" [emphasis sic]); *United States v. Smith*, 413 F.3d 1253, 1281 (10th Cir.2005) (request made six days before trial untimely).

**{¶ 77}** Neyland's request for self-representation was untimely because he did not make it until just before the beginning of the trial-phase closing arguments. Thus, we hold that the trial court did not err in denying Neyland's late request for self-representation.

**{¶ 78}** But Neyland argues that the trial court sidestepped the issue and never addressed his request to waive counsel. Upon learning of Neyland's intent to request self-representation, the trial court informed the parties that he was going to deny this request because it was untimely. Nevertheless, the trial court allowed Neyland to make his request for self-representation and voice any other concerns that he had about the proceedings. After Neyland finished, the trial court said, "You've raised these issues, and the Court is denying your request at this time." Thus, the record shows that the trial court did consider Neyland's request for self-representation and denied it for being untimely.

**{¶ 79}** Neyland also argues that the trial court erred by failing to consider whether he was competent to represent himself. *See Indiana v. Edwards*, 554 U.S. 164, 177-178, 128 S.Ct. 2379, 171 L.Ed.2d 345 (2008). However, the trial court did not need to determine Neyland's competency to represent himself, because Neyland's underlying request was untimely.

**{¶ 80}** Based on the foregoing, we reject proposition XIV.

3. *Leg restraints* (Propositions of law II and III)

**{¶ 81}** In proposition of law II, Neyland argues that the trial court erred when it ordered Neyland to wear leg restraints without a valid reason.

**{¶ 82}** No one should be tried while shackled, absent unusual circumstances. *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 219, citing *Illinois v. Allen*, 397 U.S. 337, 344, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). The use of restraints tends to erode the presumption of innocence that the justice system attaches to every defendant. *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, ¶ 79. But it is widely accepted that a prisoner may be shackled when there is a danger of violence or escape. *State v. Woodards*, 6 Ohio St.2d 14, 23, 215 N.E.2d 568 (1966). The decision to require restraints is left to the sound discretion of the trial court, which is in a position to consider the prisoner's actions both inside and outside the courtroom, as well as his demeanor while the court is in session. *Franklin* at ¶ 79.

### a. Rulings on leg restraints

**{¶ 83}** On April 10, 2008, defense counsel filed a motion requesting that Neyland appear at all proceedings without restraints. On June 2, 2008, the trial court denied this motion.

**{¶ 84}** On August 25, 2008, during a pretrial session outside the defendant's presence, the trial court discussed the potential that Neyland might become disruptive during trial based on his propensity "to insist on certain subject matters being addressed" and that "he may become out of control a little bit" if the court "rules against him on relevance." The trial court added, "I don't know what we can do other than obviously using some sort of restraint, but I guess now is the time to talk about it so that we're not all caught off guard." The court also said, "Other than that he's been pretty well-behaved."

**{¶ 85}** In response, defense counsel said, "In fairness to Calvin it's hard to predict, he's very unpredictable, but I would anticipate he would be demonstrative, not necessarily disruptive." Defense counsel also mentioned that he has had previous clients wear leg shackles that were hidden from the jury by an apron in front of counsel's table.

**{¶ 86}** During pretrial proceedings on September 24, 2008, the trial court stated that it was considering having Neyland wear either leg irons or some other leg restraint under his pants and that placing skirting around the table would ensure that the jury could not see that Neyland was restrained. The trial court also mentioned that there would be two or three deputies in the courtroom.

**{¶ 87}** During pretrial proceedings on October 8, 2008, the bailiff indicated that a leg restraint had been found that would fit Neyland. He stated that Neyland would walk with a "slight gate [sic]," apparently meaning that Neyland's gait would be slightly impaired. During pretrial proceedings on October 15, 2008, the trial court stated that a leg restraint would be used and that a skirt around the defense counsel's table would not be necessary.

**{¶ 88}** After trial began, the state filed a motion to have Neyland wear two leg restraints because he had figured out how to manipulate the single one. During a hearing on the motion, the trial court asked defense counsel if they wanted to have an evidentiary hearing. Defense counsel responded, "We'll leave it up to the sheriff's department." Defense counsel added, "My experience with leg braces, * * * the defendant has figured out how to unlock it or manipulate it or something, which I think that's not a secret how to do that. * * * Again, * * * let's not do anything at this point unless the sheriff thinks it's appropriate."

**{¶ 89}** The trial court then stated:

> And he is obviously a big individual. We have tried to do the most we could in terms of not restraining him certainly in a visible way, and that's our effort is to not have the jury even be aware. From what I've been able to see thus far, no one would even know. What I think I'll do is authorize it but leave it at the discretion of the sheriff's department. Does that seem fair? And if they feel it's appropriate, they can do it.

**{¶ 90}** Both the prosecutor and the defense counsel expressed their agreement. The trial court said, "We'll leave it at that. That will be the order of the Court." Subsequently, the trial court issued an order granting the state's motion to require Neyland to wear a second leg restraint at trial "if deemed necessary by the Wood County Sheriff."

b. Analysis

(1) *First leg restraint*

**{¶ 91}** Neyland claims that the trial court ordered him to wear restraints without any showing that restraints were necessary because of his disruptive behavior.

**{¶ 92}** The trial court granted the state's request on shackling without first conducting a hearing to consider whether evidence showed that shackling was necessary. We continue to emphasize that prior to ordering a defendant to wear restraints, the trial court should hold a hearing on the matter. *Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, at ¶ 82.

**{¶ 93}** The United States Court of Appeals for the Sixth Circuit has held that when considering whether to physically restrain a defendant during trial, the court should conduct a formal hearing with sworn testimony to resolve factual disputes and preserve the appellate record. *United States v. Perry*, 401 Fed.Appx. 56, 63 (6th Cir.2010) However, the United States Supreme Court has not held that such a hearing is required. *See Deck v. Missouri*, 544 U.S. 622, 629, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005).

**{¶ 94}** We have also held that a hearing on the necessity for restraints is not an "absolute rule." *Franklin* at ¶ 82. In *Franklin*, we stated, "Where the facts and circumstances surrounding a defendant illustrate a *compelling need* to impose exceptional security procedures, the trial court's exercise of discretion in this

regard should not be disturbed unless its actions are not supported by the evidence before it." (Emphasis added.) *Id.*

{¶ 95} While there was no formal hearing, the trial court's reasons for ordering Neyland to wear a leg restraint can be gleaned from the record. During the pretrial session on August 25, 2008, the judge voiced his concerns about Neyland's potential for disruptive courtroom behavior. Defense counsel stated that Neyland was "very unpredictable" and acknowledged that he "would be demonstrative, not necessarily disruptive."

{¶ 96} The trial court had observed Neyland's demeanor in court. The trial court had also heard two psychologists and two psychiatrists testify at the competency hearing about Neyland's bizarre thinking and paranoid behavior. The trial court was also mindful that Neyland was a large man and that sheriff's deputies might have difficulty in handling him if he became disruptive. Neyland's driver's license stated that he stood six feet, three inches tall and weighed 250 pounds.

{¶ 97} Yet nothing shows that Neyland had been disruptive in court or had been violent or disruptive in jail. Indeed, the trial court stated that Neyland had been "pretty well-behaved." *Compare Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, at ¶ 80-81 (defendant demonstrated a propensity for violence and a psychologist described him as a "time bomb waiting to happen"); *Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, at ¶ 55 (defendant had a history of violent felonies and committed a murder in prison).

{¶ 98} The trial court provided limited reasoning as to why it found a compelling need to keep Neyland shackled. Yet the trial judge was in a position to consider Neyland's actions inside and outside the courtroom and voiced his concerns about Neyland's potential for disruptive courtroom behavior. A "court need not sit by helplessly waiting for a defendant to commit a violent or disruptive act in the courtroom before being cloaked with the power to invoke

extra security measures." *Franklin* at ¶ 79. Thus, we hold that the trial court did not abuse its discretion in ordering Neyland to wear a leg restraint.

(2) *Second leg restraint*

{¶ 99} After trial began, the trial court granted the state's request for Neyland to wear a second restraint, but left it to "the discretion of the sheriff's department." As an initial matter, the record is unclear whether Neyland was actually placed in a second leg restraint following the trial court's ruling. In any event, defense counsel failed to object and thus waived all but plain error.

{¶ 100} Neyland argues that the trial court erred by leaving the final decision on wearing a second restraint to the sheriff's discretion. "The trial court must exercise its own discretion and not leave the issue up to security personnel." *State v. Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, ¶ 104; *see also United States v. Miller*, 531 F.3d 340, 345-346 (6th Cir.2008).

{¶ 101} Accordingly, the trial court erred by leaving the final decision on wearing a second leg restraint to the sheriff's discretion.

{¶ 102} Even assuming that Neyland wore a second restraint for the remainder of the trial, we hold that there was no plain error. The leg restraints were under Neyland's pants and not visible to the jury. But Neyland argues that when he went to the podium to make an unsworn statement during the mitigation phase of the trial, his constrained movements must have been visible to the jury. However, nothing in the record indicates that the jury observed Neyland walking with constrained movements before he made his unsworn statement. Neyland bears the burden on plain-error review, and he has not met that burden. Thus, this claim is rejected. *See Miller*, 531 F.3d at 347.

(3) *Defense arguments*

{¶ 103} Neyland argues that the trial court failed to consider lesser alternatives, such as the employment of extra deputies, before ordering that he wear leg restraints. Some Ohio courts of appeals have held that a trial court has

25

"a duty to determine whether there is a 'less prejudicial but adequate means of providing security' " before ordering restraints. *State v. McCree*, 5th Dist. Richland No. 10CA133, 2011-Ohio-4114, 2011 WL 3652755, ¶ 14, quoting *Lakin v. Stine*, 431 F.3d 959, 964 (6th Cir.2005); *State v. Davis*, 2d Dist. Clark No. 2011 CA 15, 2012-Ohio-1225, 2012 WL 996909, ¶ 15; *State v. Mitchell*, 6th Dist. Williams No. WM-05-004, 2006-Ohio-5117, 2006 WL 2790333, ¶ 29.

{¶ 104} The trial court did discuss the use of deputies to provide courtroom security. The trial court also discussed the option of using a stun belt. The bailiff stated that two uniformed deputies would be with the defendant at all times. But the presence of additional deputies was not discussed as a lesser alternative to the use of leg restraints.

{¶ 105} The trial court should have considered whether there were lesser alternatives to the use of leg restraints to provide adequate courtroom security. Nevertheless, the trial court used restraints that were not visible to the jury rather than shackles or other visible types of restraints. Even though the record is unclear, it appears that the trial court considered the presence of deputies *and* the use of leg restraints as the least form of restraint necessary to ensure courtroom security. Under these circumstances, we reject this claim.

{¶ 106} Finally, Neyland argues that the leg restraints inhibited his interaction with defense counsel and thus interfered with his Sixth Amendment right to counsel. However, the defense never asserted that restraints interfered with the attorney-client relationship and thus waived all but plain error.

{¶ 107} No plain error occurred. Nothing in the record indicates that Neyland's leg restraints inhibited his communication with counsel with respect to his defense. Both of Neyland's hands were free throughout the trial. Neyland also does not claim that the restraints impeded his ability to follow the proceedings and take an active interest in the presentation of his case. Indeed, when asking to represent himself, Neyland said that he had taken pages and pages

of notes that he wanted counsel to use during cross-examination. The trial court responded, "I noticed that they [defense counsel] were paying attention to you when you offered points." *See State v. Chester*, 10th Dist. Franklin No. 08AP-1, 2008-Ohio-6679, 2008 WL 5265860, ¶ 14.

(4) *Harmless error beyond a reasonable doubt*

{¶ 108} Even assuming that the trial court abused its discretion in ordering Neyland shackled, we find that such error was harmless. Nothing in the record shows that the jury observed Neyland in leg restraints, and he was not prejudiced.

{¶ 109} Moreover, even if the jurors *observed* Neyland in shackles, any error was harmless beyond a reasonable doubt.

> [W]here a court, without adequate justification, orders the defendant to wear *shackles that will be seen by the jury*, the defendant need not demonstrate actual prejudice to make out a due process violation. The State must prove "beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained."

(Emphasis added.) *Deck*, 544 U.S. at 635, 125 S.Ct. 2007, 161 L.Ed.2d 953, quoting *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

{¶ 110} The state can meet this burden because overwhelming evidence of Neyland's guilt was presented at trial. Evidence showed that Neyland was scheduled to meet with Lazar and Smith about the termination of his employment as a truck driver with Liberty Transportation. After arriving at Liberty, Neyland shot Lazar several times in the back and then walked upstairs to Smith's office and shot him once in the head. Neyland's murder of Smith can be heard on a 9-1-1 tape that was introduced at trial. A handgun was found in Neyland's truck after

the police arrested him. Forensic testing matched this handgun with bullets and shell casings found at the murder scene and with a bullet recovered from the autopsy of Thomas Lazar. Gunshot residue was found on Neyland's hands. Investigators also found pieces of paper in Neyland's storage unit on which three pennies were arranged in a triangular pattern that matched the triangular gunshot pattern on Lazar's back. The paper contained the words, "OOOO, I'm so scared. Three Round Shot Group." There was also the statement, "You think I'm playing[.] You're gonna come up missing!!!" Thus, there is little chance that leg restraints, even if observable, affected the verdict or the sentence in this case.

{¶ 111} In proposition of law III, Neyland argues that defense counsel provided ineffective assistance of counsel by failing to object to the trial court's order that he wear leg restraints. Neyland also argues that counsel was deficient by failing to set forth the relevant case law on this issue.

{¶ 112} Reversal of a conviction for ineffective assistance requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Accord State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus.

{¶ 113} Contrary to Neyland's claim, the record shows that defense counsel filed a pretrial motion asking that Neyland appear at all proceedings without restraints. Review of defense counsel's motion also shows that it included citations to relevant case law.

{¶ 114} Yet defense counsel failed to renew their objection when the state requested that Neyland be ordered to wear a second leg restraint. The record is unclear whether Neyland was actually placed in a second restraint after the trial court's order. But even assuming that he was, he cannot establish any resulting prejudice, because nothing shows that the leg restraints were visible to the jury.

*See State v. Ayers*, 12th Dist. Warren Nos. CA2010-12-119 and CA2010-12-120, 2011-Ohio-4719, 2011 WL 4346678, ¶ 61.  Thus, this claim lacks merit.

{¶ 115} Based on the foregoing, we overrule propositions II and III.

4. *Failure to file motions to suppress*  (Proposition of law VII)

{¶ 116} Neyland argues that trial counsel were ineffective by failing to file motions to suppress his statements to police and the evidence seized from the search of his motel room.

a. Failure to challenge admission of Neyland's pretrial statements

{¶ 117} Under *Strickland*, Neyland must demonstrate that trial counsel were deficient.  This requires Neyland to establish that a basis existed to suppress his pretrial statements.  *Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, at ¶ 35.

{¶ 118} The state introduced statements Neyland made to the SWAT team at the time of his arrest outside the Silver Blue Motel.  Det. Sgt. Enrico Galimberti, the SWAT team leader, testified that Neyland was removed from his tractor and placed on the ground with his hands out to the side.  According to Galimberti, Neyland blurted out, "I was going to turn myself in."  He also said, "I want the letter.  There's a letter in my truck.  It's to my brother.  It's my last will.  Can I get that letter?"  Before handcuffing Neyland, Galimberti asked Neyland if he had any weapons.  Neyland responded, "No, the gun is in the truck by the door."

{¶ 119} First, the requirement that police officers administer *Miranda* warnings applies only when a suspect is subjected to both custody and interrogation.  *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (prohibiting "custodial interrogation" without warnings).  Neyland was arrested and almost immediately stated that he was going to turn himself in and wanted the letter containing his last will that was in the tractor.  An unsolicited and spontaneous statement such as the one made by Neyland in this

case is not the product of interrogation, so *Miranda* does not apply. *Rhode Island v. Innis*, 446 U.S. 291, 300, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *State v. Dunn*, 131 Ohio St.3d 325, 2012-Ohio-1008, 964 N.E.2d 1037, ¶ 24.

{¶ 120} Second, under the public-safety exception to *Miranda* established in *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), police officers can ask a suspect questions without first giving *Miranda* warnings if they reasonably believe it is "necessary to secure their own safety or the safety of the public." *Id*. at 659. Recognizing a "narrow exception" to the *Miranda* rule, *id.* at 658, *Quarles* reasoned that "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *Id.* at 657. Galimberti asked Neyland about the whereabouts of a weapon, because a gun had been used recently in killing Lazar and Smith. Moreover, Neyland was arrested in the parking area of a motel and the firearm would have posed a threat to public safety. Thus, Galimberti's questioning appears to have been warranted by the public-safety exception to *Miranda*.

{¶ 121} Neyland argues that trial counsel should have filed a motion to suppress his statements because of his history of mental-health problems, including, at a minimum, a severe personality disorder. However, Neyland's mental problems would not serve as a basis for challenging either Neyland's unsolicited and spontaneous statements or his response to the question about weapons. *See Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

{¶ 122} Trial counsel could have decided that any motion to suppress Neyland's statements to the police would have been pointless. *See Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, at ¶ 38. Accordingly, we hold that trial counsel were not deficient by failing to challenge the admissibility of Neyland's pretrial statements.

b. Failure to challenge search warrant

{¶ 123} Neyland argues that his counsel were ineffective by failing to file a motion to suppress the evidence seized during the search of his motel room. The search yielded numerous weapons and other evidence that was admitted at trial.

{¶ 124} Following Neyland's arrest, Michigan authorities obtained a search warrant for what they believed to be Neyland's motel room. A search of that room uncovered no evidence. On the following day, the police learned that they had searched the wrong room. Monroe County Sheriff's Detective Tom Redmond then obtained a search warrant for the motel room where Neyland had actually stayed. Police searching that motel room seized an array of firearms and ammunition, a stun gun, handcuffs, and a couple of Hawaiian shirts.

{¶ 125} During trial, Neyland filed a pro se motion challenging the legality of the search warrant used in searching his motel room. The trial court denied the motion as not timely filed. Following the completion of the state's case, the trial court revisited Neyland's motion, stating:

> After hearing the testimony, and, by the way, I ruled that it was not timely filed. Now that I have heard the testimony on all of it and have these exhibits, I do find that there is no basis to take those back. There was certainly probable cause for each of these search warrants. They appeared to be only obtained after there was probable cause, and they appeared to be properly executed. So I'm going to so rule at this time and consider, since the motion wasn't filed in time to have a separate hearing on that issue, the Court is going to determine it on its own based on the exhibits.

**{¶ 126}** " 'Where the record contains no evidence which would justify the filing of a motion to suppress, the appellant has not met his burden of proving that his attorney violated an essential duty by failing to file the motion.' " *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 208, quoting *State v. Gibson*, 69 Ohio App.2d 91, 95, 430 N.E.2d 954 (8th Dist.1980). Further, " 'failure to file a suppression motion does not constitute per se ineffective assistance of counsel.' " *State v. Madrigal*, 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000), quoting *Kimmelman v. Morrison*, 477 U.S. 365, 384, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986).

**{¶ 127}** Neyland specifies no reason why the search warrant could have been legitimately challenged. The affidavit for the search warrant provided detailed facts supporting probable cause for the search of Neyland's motel room. The search warrant specified the location to be searched (the motel room) and the property to be searched for and seized (9 mm handgun and other weapons and evidence pertinent to the investigation). Thus, the warrant was valid.

**{¶ 128}** Moreover, the trial court ultimately found that there was probable cause for the search of the motel room. Thus, Neyland cannot show that he was prejudiced by trial counsel's failure to file a motion to suppress. This claim also lacks merit.

**{¶ 129}** Based on the foregoing, we overrule proposition VII.

*5. Jury selection* (Proposition of law XI)

**{¶ 130}** Neyland argues that the trial court erred in excusing four prospective jurors. He argues that under *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and R.C. 2945.25(C), it is improper to excuse a prospective juror for cause in the death-qualification process unless that juror unequivocally states that he would not recommend death under any circumstances.

{¶ 131} However, the constitutional standard for determining when a prospective juror may be excluded for cause based upon his or her views on capital punishment is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath. *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); *State v. Rogers*, 17 Ohio St.3d 174, 478 N.E.2d 984 (1985), paragraph three of the syllabus. This court has held that if a juror satisfies the *Witt* criterion, he may be excluded for cause under the catch-all provision of R.C. 2945.25(O) even though he does not satisfy the more specific R.C. 2945.25(C). *State v. Williams*, 99 Ohio St.3d 493, 2003-Ohio-4396, 794 N.E.2d 27, ¶ 40. Thus, we evaluate Neyland's claim under the *Witt* standard.

{¶ 132} First, Neyland argues that the trial court abused its discretion in excusing prospective juror No. 17, because this juror stated that he could follow the court's instructions. During voir dire, juror No. 17 stated that he could follow the court's instructions "in most cases." When asked to explain, juror No. 17 stated that "there is a thing called juror nullification that I might have to consider given the certain circumstances, which I think would be rare." The trial court then asked, "You understand that if you did do that, you would be violating your oath as a juror?" Juror No. 17 replied, "Well, I think there is a higher oath than this." Over defense objection, the trial court excused this juror for cause, because "he just couldn't unequivocally indicate he would follow the Court's instruction."

{¶ 133} A trial court's resolution of a challenge for cause will be upheld on appeal unless it is unsupported by substantial testimony. *Williams* at ¶ 45. Juror No. 17 refused to promise to follow the trial court's instructions and reserved the right to consider engaging in juror nullification in some circumstances. Thus, the trial court did not abuse its discretion in excusing this juror for cause.

**{¶ 134}** Second, Neyland argues that the trial court abused its discretion in excusing prospective juror No. 24 for cause, because that juror stated that she could vote to impose the death penalty, even though she expressed reluctance to provide a blanket "yes" that would cover all contingencies. Juror No. 24 was opposed to the death penalty. She provided contradictory answers as to whether she would follow the instructions on the death penalty. Juror No. 24 told the trial court, "I could follow [the instructions]; but I don't know if my view would change or not. I can't say at this time." She also told the prosecutor, "I honestly can't say" when asked whether she would follow such instructions. Juror No. 24 told defense counsel, "Yeah, I guess I would consider that." Over defense objection, juror No. 24 was excused for cause.

**{¶ 135}** This juror's final statement to defense counsel, viewed in isolation, does not suggest that she would be substantially impaired in performing her duties as a juror. "However, where a prospective juror gives contradictory answers on voir dire, the trial judge need not accept the last answer elicited by counsel as the prospective juror's definitive word. * * * Rather, 'it is for the trial court to determine which answer reflects the juror's true state of mind.' " *State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, 781 N.E.2d 980, ¶ 66, quoting *State v. Jones*, 91 Ohio St.3d 335, 339, 744 N.E.2d 1163 (2001). Juror No. 24 equivocated on whether she would follow the trial court's instructions. Thus, substantial evidence supported excluding this juror. We hold that the trial judge did not abuse his discretion in doing so. *See State v. Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, ¶ 123.

**{¶ 136}** Third, Neyland argues that the trial court abused its discretion in excusing prospective juror No. 55, because this juror provided "strong answers" indicating that she could follow the law. Juror No. 55 stated that she "would have a hard time doing it," but she would follow the instructions on the death penalty, "[i]f legally I have to do it." There was also the following exchange:

The Court: So there are some times when you could get by your personal beliefs and impose the death penalty?

Juror 55: Possibly.

The Court: You're still hedging on me here.

Juror 55: I know I am. I cannot say 100 percent, yes, I could do it or, no, I cannot, first of all because I've never truly had to make that decision on somebody's life. And we all think about it. But when it truly comes down to me having to make that decision in that instance when I had to answer that, I still go, I'm not a hundred percent convinced either way.

{¶ 137} The trial court, over defense objection, excused juror No. 55 for cause, stating:

She was not unequivocal about anything. And if that's an understatement, I apologize. I'm going to find that her beliefs do impair her ability to serve as a juror. Even though she did seem to voice some desire to please the Court, she also seemed to indicate that her personal beliefs were such that she just couldn't do it. So that's a close call, I have to admit * * *.

{¶ 138} The record supports the trial court's decision to excuse juror No. 55. She provided equivocal responses on her ability to follow the trial court's instructions on the death penalty. Moreover, on her juror questionnaire, juror No. 55 responded "No" when asked whether she could "consider fairly" the court's instructions on the death penalty.

{¶ 139} Neyland argues that juror No. 55 should not have been excused because the trial court acknowledged that his decision was a "close call." But the trial court's determination that juror No. 55 was impaired is entitled to deference. Where, as here, a juror gives conflicting answers, it is for the trial court to determine which answer reflects the juror's true state of mind. *Jones*, 91 Ohio St.3d at 339, 744 N.E.2d 1163.

{¶ 140} Finally, Neyland argues that the trial court abused its discretion in excusing prospective juror No. 111 for cause, because this juror expressed his willingness to follow the law. Juror No. 111 stated that his religious beliefs would make it difficult to impose the death penalty: "I believe that * * * God has that say of whether to take life. And again, only as a last resort and if I'm commanded to by you people. But I certainly wouldn't want to make that decision by any means if I didn't have to, you know." Juror No. 111 also acknowledged that his religious beliefs "would be a factor" in weighing the aggravating circumstances and the mitigating factors. But Juror No. 111 also stated that he would "follow the law." Over defense objection, juror No. 111 was excused for cause.

{¶ 141} "A prospective juror's conscientious or religious opposition to the death penalty in and of itself is not grounds for a challenge for cause." *State v. Treesh*, 90 Ohio St.3d 460, 468, 739 N.E.2d 749 (2001). But juror No. 111's answers demonstrate that his strong religious views might impair his ability to perform his duties as a juror. Indeed, he indicated that he would recommend death "only * * * if I'm commanded to by you people," which would never happen.

{¶ 142} Moreover, the trial court had also reviewed juror No. 111's questionnaire. On the questionnaire, the prospective jurors were asked, "If instructed by the Court to consider fairly the imposition of a sentence of death, would you be able to follow the Instruction?" Juror No. 111 responded, "If this

court or my country asked me to and I had no other choice I guese [sic] I would have to, I really believe it is up to god weather [sic] we live or die, I believe it is God desicision [sic]."

{¶ 143} Here again, the trial court's determination that juror No. 111's religious views "would substantially impair the performance of his duties" is entitled to deference. *See Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, at ¶ 126. We hold that the trial court did not abuse its discretion in excusing this juror for cause. Proposition XI is overruled.

6. *Prosecutorial misconduct* (Proposition of law XII)

{¶ 144} Neyland argues that the prosecutor committed misconduct by making improper victim-impact comments and eliciting improper victim-impact testimony. But defense counsel failed to object to the prosecutor's comments and questions and thus waived all but plain error. *State v. Childs*, 14 Ohio St.2d 56, 236 N.E.2d 545 (1968), paragraph three of the syllabus.

{¶ 145} The test for prosecutorial misconduct is whether the remarks were improper and, if so, whether they prejudicially affected the accused's substantial rights. *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). The touchstone of the analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

{¶ 146} First, Neyland argues that the prosecutor committed misconduct during opening statements by remarking, "I'd really like to introduce you to Doug Smith and Tomm Lazar, unfortunately I'm never going to be able to do that because the Defendant, Calvin Neyland, Jr., purposely killed them on August 8th, 2007." Neyland asserts that these comments were irrelevant to his guilt or innocence and inflamed the passions of the jury.

{¶ 147} During opening statements, counsel is accorded latitude and allowed fair comment on the facts to be presented at trial. *State v. Leonard*, 104

37

Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 157. However, it is questionable whether the prosecutor's comment about Lazar's and Smith's inability to appear was proper. *See State v. Biros*, 78 Ohio St.3d 426, 454, 678 N.E.2d 891 (1997) (prosecutor's argument that unlike the defendant, the deceased victim "did not have the opportunity to testify" was improper). But the comments were brief and not overly emotional. Moreover, the trial court instructed the jury that the opening statements of counsel were not evidence. Thus, no plain error occurred.

{¶ 148} Next, Neyland argues that the prosecutor committed misconduct by presenting testimony that Lucinda Collins was Smith's fiancée. During her introductory testimony, Collins testified that she had been engaged to Smith for two years. Neyland contends that such testimony constituted improper victim-impact evidence.

{¶ 149} "Evidence relating to the facts attendant to the offense is 'clearly admissible' during the guilt phase, even though it might be characterized as victim-impact evidence." *McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, at ¶ 98, quoting *State v. Fautenberry*, 72 Ohio St.3d 435, 440, 650 N.E.2d 878 (1995).

{¶ 150} Collins's preliminary testimony about her relationship with Doug Smith explained why she was knowledgeable about Smith's problems with Neyland and laid the foundation for Collins's later testimony about these matters. *See State v. Hartman*, 93 Ohio St.3d 274, 293, 754 N.E.2d 1150 (2001). We hold that Collins's testimony was relevant, and no plain error occurred.

{¶ 151} Based on the foregoing, we reject proposition XII.

7. *Other weapons and ammunition* (Proposition of law XV)

{¶ 152} Neyland argues that the trial court erred in allowing the state to introduce evidence of weapons and ammunition not related to the charged offenses.

a. Facts

{¶ 153} The state presented photographs of weapons and ammunition that the police seized during their search of Neyland's motel room and storage units. The state also presented a cooler bag containing a stun gun, two knives, handcuffs, and 9 mm ammunition. These weapons and ammunition were not linked to the murders themselves. But the state argued that such evidence was relevant to prove Neyland's prior calculation and design, which is an element of the aggravated-murder charges. The trial court, over defense objection, permitted police officers to testify about these weapons and ammunition and also admitted their photographs.

(1) *Neyland's storage unit*

{¶ 154} Perrysburg Detective Monica Gottfried testified about the weapons and ammunition found in one of Neyland's storage units and used photographs to show them to the jury. Four of these photographs displayed two rifles with silencers and two cases of ammunition. A separate photograph displayed all the weapons and ammunition that the police found in the storage unit, including at least six rifles.

(2) *Neyland's motel room*

{¶ 155} Perrysburg Detective James Gross testified about the weapons and ammunition found in Neyland's motel room. He said that "it appeared to be an arsenal." Gross found weapons on the floor next to the bed. He used a photograph to show the weapons and ammunition after they had been placed on the bed. This photograph displayed two rifles, a handgun, several weapons magazines, and boxes of ammunition. Gross also testified that a cooler bag found in the room contained a camouflaged lock-blade knife, a folding-blade Leatherman-style tool knife, a stun gun, a pair of handcuffs, and two magazines loaded with 9 mm ammunition.

b. Analysis

{¶ 156} In *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, the state presented evidence about firearms and ammunition that were seized from the defendant but not used in the murders. The trial court, over defense objection, permitted testimony that 19 firearms not used in the murders were found in the defendant's basement. *Id*. at ¶ 102-103. The state argued that the firearms in the basement were relevant in proving that Trimble murdered the victim with prior calculation and design as charged in one of the aggravated-murder counts. *Id*. at ¶ 105. This court stated: "We reject this argument because the weapon used to kill [the victim] was unmistakably identified and admitted into evidence. The other firearms were not used in [the victim's] murder and thus had no relevance to prove that Trimble murdered her with prior calculation and design." *Id*. at ¶ 106.

{¶ 157} As in *Trimble*, the 9 mm handgun used in killing Lazar and Smith was identified and admitted into evidence. The other weapons and ammunition found in Neyland's motel room and storage unit had no connection with the murders. Thus, these other weapons and ammunition had no relevance in proving Neyland's prior calculation and design as charged in the aggravated-murder offenses. We hold that the trial court erred in admitting this other evidence.

c. Harmless error

{¶ 158} We must now determine whether the erroneous admission of the weapons and ammunition constituted harmless error. "Nonconstitutional error is harmless if there is substantial other evidence to support the guilty verdict." *State v. Webb*, 70 Ohio St.3d 325, 335, 638 N.E.2d 1023 (1994). In *Trimble*, we employed such an analysis in finding that the error in admitting the firearms was harmless. In that case, we found that overwhelming evidence established Trimble's guilt. *Id*. at ¶ 111. We also concluded that the jury did not impose the death penalty based on the fact that Trimble owned many firearms. *Id*. In

reaching that conclusion, we emphasized that the firearms found in the basement were not readmitted during the penalty phase. *Id*.

{¶ 159} As discussed in proposition II, overwhelming evidence was introduced that established Neyland's guilt. Moreover, the evidence of Neyland's other weapons and ammunition was less prejudicial than the presentation of such evidence in *Trimble*. In *Trimble*, the state displayed the weapons and ammunition upon two long tables in the courtroom during the testimony of one of the police officers. *Id*. at ¶ 114. The trial court also allowed the firearms to be in the jury room during the trial-phase deliberations. *Id*. at ¶ 115. In contrast, the prosecutor in the present case introduced mostly photographs of the firearms and ammunition, and the photographs were not readmitted during the penalty phase. Thus, we conclude that the jury did not impose the death penalty because of the other weapons and ammunition. Proposition XV is overruled.

B. *Penalty-phase issues*

1. *Former testimony* (Proposition of law XIII)

{¶ 160} Neyland argues that the trial court erred in admitting the former testimony of Dr. Delaney Smith as a rebuttal witness in the penalty phase, because it violated his right to confrontation and due process.

a. Facts

{¶ 161} Dr. Thomas G. Sherman, a psychiatrist, testified as a defense mitigation witness. Dr. Sherman had conducted a competency evaluation of Neyland, and he testified during mitigation that "it was crystal clear to me that [Neyland] had a mental illness, and I thought he was incompetent to stand trial." Dr. Sherman diagnosed Neyland with "[o]ne * * * a delusional disorder, a persecutory type. And second * * * schizophrenia, a more severe form of that illness."

{¶ 162} Dr. Sherman provided examples of Neyland's behavior that supported his findings. First, Neyland moved out of his house and into his truck

because he believed that people were breaking into his house to listen to his answering machine. Second, Neyland mentioned that prophylactics were showing up all the time in his laundry. Finally, Neyland left bizarre notes in his storage unit saying, "I'm so scared" and other comments possibly related to the killings.

{¶ 163} As it relates to the mitigating factors, Dr. Sherman testified that at the time of committing these offenses, because of a mental disease or defect, Neyland lacked substantial capacity to conform his conduct to the requirements of the law.[1] Dr. Sherman concluded, "[A]ll of this indicates to me [that] he had a severe mental illness of a paranoid type, that he suspected virtually everybody of something, that probably would have not taken very much to tip him off."

{¶ 164} The state called Dr. Barbra Bergman and Dr. Kristen Haskins as rebuttal witnesses. Both witnesses had also conducted competency evaluations of Neyland. Dr. Bergman, a psychologist, testified that Neyland was not suffering from a mental illness but had a severe personality disorder. Dr. Bergman stated that she could not determine whether Neyland lacked substantial capacity to appreciate the criminality of his conduct because Neyland would not talk to her about his criminal conduct.

{¶ 165} Dr. Haskins, a psychologist, testified that Neyland had a "mixed personality disorder." She stated, "[H]e's capable of choosing his behaviors and actions and of making decisions. And there were no indications that those were tainted by any kind of severe mental illness."

{¶ 166} Dr. Delaney Smith, a psychiatrist, was also a rebuttal witness, although she was not present for the hearing. The prosecutor sought to introduce Dr. Smith's former testimony at the competency hearing in lieu of calling her as a

---

[1] The R.C. 2929.04(B)(3) statutory mitigating factor states, "Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law."

witness in the penalty phase, because she was on maternity leave. The prosecutor stated that Dr. Smith had been subpoenaed, but that the legal department at Twin Valley Behavioral Health Care, where Dr. Smith worked, notified the state that Dr. Smith was unavailable because she was on maternity leave. The prosecutor also presented a letter from a nursing supervisor at Twin Valley, dated November 3, 2008, stating that Dr. Smith was aware of the subpoena, but was currently on maternity leave and "will be unavailable until after the first of the year."

{¶ 167} Defense counsel objected to admitting Dr. Smith's former testimony from the competency proceedings during mitigation, arguing that "the issue before the Court at that time is significantly different than the issue before the jury today." The defense asked that Dr. Smith's testimony be excluded, on the basis that "the party against whom the testimony [is] being offered does not have the same motive to develop testimony today as we would have had back in the competency hearing * * *."

{¶ 168} The trial court overruled the defense objection, stating:

And in looking at this * * *, hearsay is permitted even though the unavailability of this witness would probably make the transcript admissible regardless, so hearsay is not really, and I'm not sure that's the defense's objection, the competency issue, the fact that that was advanced, the testimony was advanced during the competency hearing and so has all the rest of the testimony that we've heard thus far in this proceeding and this phase of it. So I don't see how that would be a problem in terms of objections. I'm going to overrule the objection and permit the State to proceed.

{¶ 169} Thereafter, the state read to the jury the transcript of Dr. Smith's former testimony from the competency hearing. Dr. Smith stated that she

observed Neyland during his 30-day inpatient stay for a competency evaluation at Twin Valley. Dr. Smith detected no signs of mental illness, but determined that Neyland had a paranoid personality disorder. Dr. Smith reviewed Dr. Sherman's report and stated that she had "more time to observe and interact with Mr. Neyland and see him in various different settings and see his interactions with different people."

{¶ 170} The former testimony included Dr. Smith's cross-examination. Dr. Smith acknowledged that it was not her job to do a competency evaluation of Neyland, and she did not complete a written report. Dr. Smith stated that she saw signs that Neyland had a paranoid personality disorder. She also reviewed Neyland's results on the Minnesota Multiphasic Personality Inventory ("MMPI") and stated that Neyland answered questions in such a way as to present himself in a very positive light. She also recognized that Neyland scored extremely low in the reasoning category of the MacCAT-CA, but characterized such low scores as resulting from his personality disorder. During redirect examination, Dr. Smith expressed her opinion that Neyland was competent to stand trial. On recross, Dr. Smith again stated that Neyland has a personality disorder. But she stated that Neyland can still make reasoned choices.

b. Analysis

{¶ 171} Neyland argues that the trial court erred in admitting Dr. Smith's former testimony from the competency hearing. Neyland claims that defense counsel's inability to cross-examine Dr. Smith denied him the right to confrontation.

{¶ 172} The Sixth Amendment to the United States Constitution provides, "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *."

{¶ 173} In *Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Supreme Court held that the admission of a testimonial

hearsay statement made by a declarant who does not testify at trial violates the Sixth Amendment unless (1) the declarant is unavailable and (2) the defendant had a prior opportunity to cross-examine the declarant.

{¶ 174} While *Crawford* did not establish a precise definition of the term "testimonial," the Supreme Court did provide some guidance, holding that, at a minimum, statements are testimonial if the declarant made them at a "preliminary hearing, before a grand jury, or at a former trial; and [in] police interrogations." *Id.* at 68. Dr. Smith's former testimony was presented during the competency hearing that was conducted during an earlier stage of Neyland's trial. Thus, Dr. Smith's testimony constituted a testimonial statement and unless it met the two requirements of *Crawford,* its admission violated Neyland's constitutional right to confrontation.

### (1) *Unavailability*

{¶ 175} The trial court determined that Dr. Smith was unavailable to testify because she was on maternity leave. Neyland asserts that it is questionable whether Dr. Smith was truly unavailable and whether the state made a good-faith effort to procure her attendance.

{¶ 176} Yet defense counsel did not object to Dr. Smith's former testimony on the basis that her unavailability had not been established. Given defense counsel's failure to dispute unavailability, Neyland has waived all but plain error as to this point. *See State v. Pasqualone*, 121 Ohio St.3d 186, 2009-Ohio-315, 903 N.E.2d 270, ¶ 14 ("Confrontation Clause rights, like other constitutional rights, can be waived"); *State v. Mitchell*, 2d Dist. Montgomery No. 24797, 2012-Ohio-3722, 2012 WL 3542309, ¶ 10 (failure to object on the basis of unavailability constitutes waiver).

{¶ 177} An alleged error is plain error only if the error is " 'obvious,' " *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002), quoting *State v. Sanders,* 92 Ohio St.3d 245, 257, 750 N.E.2d 90 (2001), and "but for the error,

the outcome of the trial clearly would have been otherwise," *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph two of the syllabus. Notice of plain error "is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.* at paragraph three of the syllabus.

{¶ 178} We hold that no plain error occurred. Dr. Smith's testimony was cumulative. Dr. Bergman and Dr. Haskins provided similar testimony that rebutted Dr. Sherman's testimony about Neyland's mental condition. Indeed, a review of Dr. Smith's testimony shows that she provided little information that was not also provided by the state's other two rebuttal witnesses. Thus, no outcome-determinative plain error occurred.

(2) *Prior Opportunity for Cross-Examination*

{¶ 179} The trial court permitted Dr. Smith's former testimony to be introduced over a defense objection that trial counsel did not have an opportunity and similar motive to cross-examine Dr. Smith at the competency hearing about Dr. Sherman's conclusion that Neyland's mental illness met the requirements as an R.C. 2929.04(B)(3) mitigating factor.

{¶ 180} *Crawford* requires a prior opportunity for the defendant to cross-examine the declarant about the testimonial statement sought to be admitted. The "prior opportunity to cross-examine" is both a "necessary" and "dispositive" requirement for the admission of testimonial statements. *Crawford*, 541 U.S. at 55, 124 S.Ct. 1354, 158 L.Ed.2d 177.

{¶ 181} Neyland argues, in effect, that *Crawford* incorporates the "similar motive" requirement set forth in Evid.R. 804(B)(1). *Crawford* did not state whether the Confrontation Clause requires a defendant to have had both an opportunity and a similar motive to cross-examine. *See Contreras*, 979 So.2d at 909. However, in *United States v. Hargrove*, 382 Fed.Appx. 765, 778 (10th Cir.2010), the United States Court of Appeals for the Tenth Circuit stated:

> *Crawford* requires only that the defendant have an opportunity to cross-examine the adverse witness at the prior proceeding—it does not require that the defendant have a similar motive at the prior proceeding. The prior motive requirement comes from the Federal Rules of Evidence, not the Confrontation Clause. *See* Fed.R.Evid. 804(b)(1).[2]

**{¶ 182}** However, Dr. Smith's former testimony must also meet the requirements of Evid.R. 804(B)(1) to be admissible. Thus, we must examine whether trial counsel had the opportunity and a similar motive to cross-examine Dr. Smith during the competency proceedings. "An identical motive to develop testimony is not required by Evid.R. 804(B)(1), only a similar motive." *State v. White*, 2d Dist. Montgomery No. 20324, 2005-Ohio-212, 2005 WL 120059, ¶ 26.

**{¶ 183}** During mitigation, Dr. Sherman testified that he had conducted a competency evaluation and determined that Neyland had a mental illness and was incompetent to stand trial. Dr. Sherman also testified that Neyland's mental illness qualified as an R.C. 2929.04(B)(3) mitigating factor. But Dr. Smith's former testimony did not purport to rebut Dr. Sherman's findings regarding the R.C. 2929.04(B)(3) factor. Rather, Dr. Smith's rebuttal was limited to challenging Dr. Sherman's findings that Neyland was incompetent and suffered from a mental illness.

**{¶ 184}** During the competency hearing, Dr. Smith had also testified that she disagreed with Dr. Sherman's findings. She concluded that Neyland suffered from a personality disorder and not a mental illness and was competent to stand

---

[2] Fed.R.Evid. 804(b)(1) provides that former testimony is admissible as an exception to the hearsay rules if "(B) [it] is now offered against a party who had * * * an opportunity and similar motive to develop it by direct, cross-, or redirect examination."

trial.  At that time, defense counsel fully cross-examined Dr. Smith.  Thus, defense counsel had "an opportunity and similar motive" to cross-examine Dr. Smith during the competency hearing as to those matters she testified to during the mitigation proceedings.

{¶ 185} However, Neyland claims that defense counsel did not have a similar motive to cross-examine Dr. Smith about Dr. Sherman's findings regarding the R.C. 2929.04(B)(3) mitigating factor.  Neyland cites *State v. Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, ¶ 87 (Moyer, C.J., dissenting), in arguing that the standard for an insanity defense and the standard for the R.C. 2929.04(B)(3) mitigating factor are not synonymous.  But in *State v. Cooey*, 46 Ohio St.3d 20, 33, 544 N.E.2d 895 (1989), the court held that a psychological report on sanity is relevant to the existence of the R.C. 2929.04(B)(3) mitigating factor, stating, "The issues involved are similar: whether a 'mental disease or defect' existed and, if so, whether and to what degree it may have impaired [the defendant's] cognition and volition."  *See State v. Evans*, 63 Ohio St.3d 231, 244, 586 N.E.2d 1042 (1992) ("the results of a competency evaluation would also be relevant to mitigation").

{¶ 186} Defense counsel was motivated at mitigation by issues similar to those at the competency hearing.  *See United States v. Salerno*, 505 U.S. 317, 326, 112 S.Ct. 2503, 120 L.Ed.2d 255 (1992) (Blackmun, J., concurring) ("Because 'similar motive' does not mean 'identical motive,' the similar-motive inquiry * * * is inherently a *factual* inquiry, depending in part on the similarity of the underlying issues and on the context of the [prior] questioning" [emphasis sic]).

> The requirement has become, not a mechanical one of identity or even of substantial identity of issues, but rather that the issues in the first proceeding, and hence the purpose for which the testimony was offered, must have been such as to produce an

adequate motive for testing on cross-examination the credibility of the testimony.

McCormick, *Evidence*, Section 304, at 495 (7th Ed.2013).

{¶ 187} Dr. Smith's testimony that Neyland suffered from a personality disorder rather than a mental illness would have also been relevant in determining the existence of the R.C. 2929.03(B)(3) mitigating factor. Defense counsel would have had a similar motive in challenging this testimony during both the competency and the mitigation hearings. Thus, we conclude that the trial court did not abuse its discretion in determining that defense counsel had a prior opportunity to cross-examine Dr. Smith pursuant to Evid.R. 804(B)(1).

{¶ 188} Based on the foregoing, proposition XIII is rejected.

2. *Prosecutorial misconduct* (Proposition of law VI)

{¶ 189} Neyland argues that the prosecutor committed misconduct during the penalty-phase opening statement and closing argument. However, except where noted, Neyland failed to object to the prosecutor's comments and thus waived all but plain error. *See State v. Wade*, 53 Ohio St.2d 182, 373 N.E.2d 1244 (1978), paragraph one of the syllabus.

{¶ 190} First, Neyland argues that the prosecutor committed misconduct during the penalty-phase opening statement by stating, "I submit to you that the heinous crime of purposely killing Doug Smith and Tomm Lazar will outweigh any mitigating factors that you will hear today beyond a reasonable doubt." Neyland argues that the prosecutor's statement that this was a "heinous crime" was an improper comment on the nature and circumstances of the offense.

{¶ 191} The prosecutor's assertion that this was a "heinous crime" was a fair and permissible comment upon the nature and circumstances of the offenses. *See State v. Beuke*, 38 Ohio St.3d 29, 32, 526 N.E.2d 274 (1988) (prosecutor's description of defendant's course of conduct as "horrible," "treacherous," and

"vicious" and a "Hollywood murder" was permissible comment upon the nature and circumstances of the offenses). Moreover, the trial court in this case instructed the jury at the beginning of the penalty phase, "We are now to the opening statements of counsel. And, again, I caution you that these are statements of counsel and are not evidence." It is presumed that the jury followed the instructions of the judge. *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 205. No plain error occurred.

**{¶ 192}** Second, Neyland argues that the prosecutor misstated the law during the penalty-phase closing argument by stating, "Now, the defendant spoke to you about the scales of justice remaining balanced. He spoke to you about the scales remaining balanced. However, that cannot happen in this case because the defendant purposely—." At this point, the defense objected. The objection was overruled, and the prosecutor continued: "Again, when the defendant spoke to you about the scales of justice, they cannot remain balanced in this case because the defendant purposely killed two people, Tomm Lazar and Doug Smith."

**{¶ 193}** Neyland argues that the prosecutor misstated the law because, if the aggravating circumstances and the mitigating factors were of equal weight, a life sentence must be imposed. *See State v. Greer*, 39 Ohio St.3d 236, 251, 530 N.E.2d 382 (1988) ("If aggravation and mitigation are in equipoise, the jury must recommend a sentence of life imprisonment").

**{¶ 194}** The prosecutor was not arguing that the jury could impose a death sentence if the aggravating circumstances and mitigating factors were balanced. Rather, the prosecutor was responding to a theme from Neyland's unsworn statement. Neyland said, "In order for the scales of justice to remain balanced, all [of the] Court's findings, in parenthesis, decisions, must be based on the rule of law * * *." Neyland later repeated, "In order for the scales of justice to remain balanced, it is not the Court's responsibility to tell the prosecutor or defense how to present the case, examining witnesses or cross-examine witnesses." Thus,

50

Neyland's claim that the prosecutor's argument misstated the law by saying that the death sentence may be imposed when the aggravating circumstances and mitigating factors are in equipoise is incorrect.

{¶ 195} We also reject Neyland's claim that the trial court erred by not giving a curative instruction, because such an instruction was unnecessary. Moreover, the trial court later instructed the jury, "If the weight of the aggravating circumstance and mitigating factors are equal, then you must proceed to consider the life sentence alternatives." Again, it is presumed that the jury followed the court's instructions. *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 145. These instructions eliminated any possible confusion about equipoise.

{¶ 196} Neyland also argues that the prosecutor's argument improperly commented on the nature and circumstances of the offense. We have held:

> Although * * * prosecutors cannot argue that the nature and circumstances of an offense are aggravating circumstances, the facts and circumstances of the offense must be examined to determine whether they are mitigating. R.C. 2929.04(B). Thus, a prosecutor may legitimately refer to the nature and circumstances of the offense, both to refute any suggestion that they are mitigating and to explain why the specified aggravating circumstance[s] outweigh mitigating factors.

*State v. Sheppard*, 84 Ohio St.3d 230, 238, 703 N.E.2d 286 (1998).

{¶ 197} The prosecutor's argument that Neyland purposely killed Lazar and Smith was proper. It simply described what the defendant did in committing the course-of-conduct aggravating circumstance.

**{¶ 198}** Finally, Neyland argues that the prosecutor encouraged the jury to "stack" the aggravating circumstances during rebuttal arguments by stating:

The Court will tell you that it is not the quantity of the evidence presented to you but in fact the quality of the evidence presented. In weighing the factors, consider that it's the defendant's choice in how he acted and reacts to certain situations. The defendant made the choice to fire eight times at Tomm Lazar and then walked immediately to his truck to go up the stairs, shoot Doug Smith in the face after yelling at him[,] "Crawl, bitch, crawl."

**{¶ 199}** "[T]he jury is obligated to separately consider each count and separately weigh the aggravating circumstance or circumstances applicable to each count against any mitigating factors." *State v. Keith*, 79 Ohio St.3d 514, 532, 684 N.E.2d 47 (1997). The prosecutor was entitled to argue that Neyland shot and killed Lazar and Smith, because Neyland had been convicted of the course-of-conduct aggravating circumstance for each killing. The prosecutor's argument did not improperly aggregate the aggravating circumstances. No plain error occurred.

**{¶ 200}** Neyland also argues that the prosecutor's rebuttal argument that the "defendant made the choice" to shoot the victims treated the nature and circumstances of the offense as aggravating circumstances. However, defense counsel opened the door to the prosecutor's rebuttal. This argument responded to defense arguments that "because of a mental disease or defect, Calvin lacked substantial capacity to conform his conduct to the requirements of the law." Both parties have latitude in responding to arguments of opposing counsel. *State v. Loza*, 71 Ohio St.3d 61, 78, 641 N.E.2d 1082 (1994). Thus, the prosecutor's

rebuttal represented fair comment, and no plain error occurred. *See State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 182.

{¶ 201} Neyland also argues that the prosecutor's argument consisted of improper victim-impact evidence. But Neyland fails to explain how the prosecutor's argument that summarized Neyland's actions in shooting Lazar and Smith was improper. Again, no plain error occurred.

{¶ 202} Based on the foregoing, we overrule proposition VI.

3. *Instructions* (Proposition of law IX)

{¶ 203} Neyland argues that the penalty-phase instructions contain various errors and that those errors necessitate a new penalty-phase hearing. However, defense counsel failed to object to these instructions and waived all but plain error. *State v. Underwood*, 3 Ohio St.3d 12, 444 N.E.2d 1332 (1983), syllabus.

{¶ 204} First, Neyland claims that the trial court should have instructed the jury that the state had to prove that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt. We reject this argument because the trial court did so instruct the jury, and its instructions on the burden of proof followed the language in R.C. 2929.03(D)(1) and (D)(2). *See State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 192.

{¶ 205} Second, Neyland argues that the trial court erred in listing the mitigating factors in the alternative, because this had the effect of limiting the jury's consideration to only one of the mitigating factors rather than all of the mitigating factors or a combination of them.

{¶ 206} The trial court provided the jury with the following instructions on considering the mitigating factors:

> Mitigating factors are factors about an individual or an offense that weigh in favor of a decision that a life sentence rather than a death sentence is appropriate. Mitigating factors are factors

that diminish the appropriateness of a death sentence. *You must consider all of the mitigating factors presented to you. Mitigating factors include, but are not limited to*, the nature and circumstances of the offense, the history, character and background of the defendant; and, A, whether at the time of committing the offense the defendant, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law; or, B, the defendant's lack of a significant history of prior criminal convictions and delinquency adjudications; or, C, any other factors that weigh in favor of a sentence other than death. *This means you are not limited to the specific mitigating factors that have been described to you. You should consider any other mitigating factors that weigh in favor of a sentence other than death.*

(Emphasis added.)

{¶ 207} The trial court's instructions clearly informed the jury that they must consider all the mitigating factors that were presented to them. Thus, we reject Neyland's claim that these instructions limited the jury's consideration to only one of the mitigating factors and hold that no plain error occurred.

{¶ 208} Third, Neyland cites *State v. Awkal*, 76 Ohio St.3d 324, 667 N.E.2d 960 (1996), in arguing that the trial court failed to instruct the jury that if they did not find that the R.C. 2929.04(B)(3) statutory factor applied, the jury should still consider such evidence under the "catch-all" R.C. 2929.04(B)(7) mitigating factor.

{¶ 209} In *Awkal*, the defendant argued that the trial court erred in instructing the jury that it could consider Awkal's psychological evidence mitigating *only if* Awkal established that he lacked substantial capacity to

appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. *Id.* at 334. In *Awkal*, the court expressly instructed the jury that it was not limited to the statutory mitigating factors in conducting the weighing process. *Id.* at 335. However, *Awkal* held that the trial court erred by failing to instruct the jury that "it could use the psychological evidence for any purpose other than establishing the statutory mitigating factor in R.C. 2929.04(B)(3)." *Id. Awkal* stated that the jury should have been instructed that "even if the jury determined that this mitigating factor was not established, it could view appellant's psychological evidence as mitigating under R.C. 2929.04(B)(7)." *Id.*

{¶ 210} The trial court did not specifically instruct Neyland's jury that if they did not find that Neyland's psychological or psychiatric evidence qualified under R.C. 2929.04(B)(3), such evidence should still be considered under R.C. 2929.04(B)(7). However, the trial court emphasized, "You must consider all of the mitigating factors presented to you. * * * This means you are not limited to the specific mitigating factors that have been described to you. You should consider any other mitigating factors that weigh in favor of a sentence other than death." Thus, *Awkal* is inapposite.

{¶ 211} In *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 172, we rejected a defense claim that the trial court erred in failing to instruct on all mitigating factors raised by the defense. *Skatzes* noted that the court did instruct the jury that it could consider " 'any other factors that are relevant to the issue of whether the offender should be sentenced to death.' " *Id. Skatzes* held that the trial court did not err in failing to tailor its instructions more to the evidence.. *Id.* The instructions in *Skatzes* and the present case were similarly worded. Thus, we conclude that the instructions on the consideration of mitigating evidence were not deficient and hold that no plain error occurred.

**{¶ 212}** Finally, Neyland claims that the trial court improperly allowed the jury to determine which trial-phase evidence was relevant to the aggravating circumstance during the penalty phase.

**{¶ 213}** During the penalty-phase instructions, the trial court advised the jurors:

> Some of the evidence and testimony that you considered in the trial phase of this case may not be considered in this sentencing phase. For purposes of this proceeding, only that evidence admitted in the trial phase that is relevant to the aggravating circumstance and to any of the mitigating factors is to be considered by you. You will also consider all of the evidence admitted during the sentencing phase together with the defendant's own statement.

**{¶ 214}** It is the trial court's responsibility to determine what trial-phase evidence is relevant in the penalty phase. *See State v. Getsy*, 84 Ohio St.3d 180, 201, 702 N.E.2d 866 (1998). Here, the trial court's instructions on relevancy limited the jury's consideration of the trial-phase evidence and testimony to the aggravating circumstance and the mitigating factors. The trial court's instructions also made it clear that the jury would see only those trial-phase exhibits that the trial court admitted and deemed relevant. Viewing the penalty-phase instructions as a whole, we conclude that the trial court's instructions adequately informed the jury as to the evidence to consider during the penalty phase. *See State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, at ¶ 251. No plain error occurred.

**{¶ 215}** Based on the foregoing, we overrule proposition IX.

4. *Sentencing opinion* (Proposition of law IV)

{¶ 216} Neyland argues that the trial court's sentencing opinion is flawed in reaching the conclusion that the aggravating circumstance outweighed the mitigating factors beyond a reasonable doubt.

{¶ 217} R.C. 2929.03(F) sets forth the findings a trial court must make when imposing a death sentence. The statute requires that the court shall state, in a separate opinion,

> its specific findings as to the existence of any of the mitigating factors set forth in division (B) of section 2929.04 of the Revised Code, the existence of any other mitigating factors, the aggravating circumstances the offender was found guilty of committing, and the reasons why the aggravating circumstances the offender was found guilty of committing were sufficient to outweigh the mitigating factors.

{¶ 218} First, Neyland argues that the trial court failed to give decisive weight to testimony that he suffers from severe mental problems in concluding that the aggravating circumstance outweighed the mitigating factors. However, the "assessment and weight to be given mitigating evidence are matters for the trial court's determination." *State v. Lott*, 51 Ohio St.3d 160, 171, 555 N.E.2d 293 (1990). Moreover, the fact that mitigation evidence is admissible "does not automatically mean that it must be given any weight." *State v. Steffen*, 31 Ohio St.3d 111, 509 N.E.2d 383 (1987), paragraph two of the syllabus.

{¶ 219} The trial court reviewed the testimony of Dr. Sherman and the state's three experts about Neyland's mental problems. The trial court concluded:

Considering all of the expert testimonies, the Court finds, as the three State's experts have opined, that defendant has a personality disorder which does not rise to the level of a "mental disease or defect" that prevented defendant from appreciating the criminality of his conduct. Defendant's personality disorder falls under the "catch-all" statutory provision and the Court accords it modest weight.

Here, the trial court considered the evidence presented about Neyland's mental problems before giving it "modest weight." The trial court could assign any or no weight to such evidence. *See State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 103. Thus, no error occurred.

{¶ 220} Second, Neyland argues that the trial court failed to consider whether the nature and circumstances of the offense were mitigating. Neyland claims that the testimony established that the killings of Smith and Lazar reflected his paranoia, psychotic condition, and bizarre behavior, which were entitled to some weight in mitigation. R.C. 2929.04(B) provides that the court, in determining whether death is an appropriate penalty, "shall consider, and weigh against the aggravating circumstances proved beyond a reasonable doubt, the nature and circumstances of the offense." Thus, the trial court was required to review these factors. *See Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, at ¶ 301.

{¶ 221} Nothing in the sentencing opinion shows that the trial court considered whether the nature and circumstances of the offense might be mitigating. But "[w]hile a sentencing court must consider all evidence of mitigation, it need not discuss each factor individually." *State v. Phillips*, 74 Ohio St.3d 72, 102, 656 N.E.2d 643 (1995), citing *Parker v. Dugger*, 498 U.S. 308, 314-315, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991). We hold that the trial court's

failure to discuss whether the nature and circumstances of the offense might be mitigating was not erroneous. In any event, our independent review of the sentence will cure any flaws in the trial court's opinion. *See Lang* at ¶ 298.

{¶ 222} As a final matter, the state concedes that the trial court failed to provide specific reasons for finding that the aggravating circumstance outweighed the mitigating factors. But the state argues that such errors can be cured during our independent review of the sentence.

{¶ 223} The trial court set forth the R.C. 2929.04(A)(5) aggravating circumstance that Neyland was found guilty of committing. The court also summarized the evidence that established Neyland's guilt of the offenses charged. The court then listed the mitigation evidence that it found Neyland was able to establish: "lack of significant criminal history, personality disorder, relatively successful and long employment history, and good behavior while in detention awaiting trial." The trial court then concluded:

> They [the mitigating factors] pale in comparison to the aggravating circumstance in this case and are only entitled to modest weight. The purposeful killing [of] two or more persons is a grave aggravating circumstance of a very serious weight.

{¶ 224} The trial court's sentencing opinion did not clearly explain why the aggravating circumstance in each count outweighed the mitigating factors. Yet the trial court's reasoning implicitly concluded that the aggravating circumstance as to each count, which was proved beyond a reasonable doubt, clearly outweighed the mitigating evidence that was presented. Our independent assessment of the evidence will purge any additional deficiency in the trial court's reasoning. *See State v. Dixon*, 101 Ohio St.3d 328, 2004-Ohio-1585, 805 N.E.2d 1042, ¶ 96-97.

**{¶ 225}** Based on the foregoing, we overrule proposition IV.

C. *Ineffective assistance of counsel*

**{¶ 226}** In propositions of law V and XIX, Neyland raises various claims that his counsel provided ineffective assistance during both phases of the trial. As previously noted, reversal of a conviction or sentence based on ineffective assistance requires finding both deficient performance and prejudice. *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674.

1. *Failure to rehabilitate prospective jurors*

**{¶ 227}** Neyland asserts that trial counsel were ineffective by failing to ask follow-up questions of prospective jurors Nos. 81, 87, and 91, who indicated that they could not impose the death penalty.

**{¶ 228}** We have consistently declined to "second-guess trial strategy decisions" or impose "hindsight views about how current counsel might have voir dired the jury differently." *State v. Mason*, 82 Ohio St.3d 144, 157, 694 N.E.2d 932 (1998). " 'Few decisions at trial are as subjective or prone to individual attorney strategy as juror *voir dire*, where decisions are often made on the basis of intangible factors.' " *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 64, quoting *Miller v. Francis*, 269 F.3d 609, 620 (6th Cir.2001). Moreover, "counsel is in the best position to determine whether any potential juror should be questioned and to what extent." *State v. Murphy*, 91 Ohio St.3d 516, 539, 747 N.E.2d 765 (2001).

**{¶ 229}** Juror No. 81 expressed strong views against the death penalty. On the jury questionnaire, juror No. 81 stated that she would be unable to follow instructions and "to consider fairly the imposition of a sentence of death." Juror No. 87 was opposed to the death penalty for religious reasons and believed that there were no circumstances in which the death penalty would be appropriate. We conclude that trial counsel were not deficient by failing to ask follow-up

questions of these jurors after they expressed intractable views opposing the death penalty. *Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, at ¶ 200.

{¶ 230} Juror No. 91 stated that he was against the death penalty "in most cases." Juror No. 91 did not rule out voting for the death penalty in all situations and said, "I can follow instructions." But juror No. 91 stated, "I would probably vote against [the death penalty]," when asked whether his beliefs would substantially impair his ability to follow the court's instructions.

{¶ 231} Trial counsel's decision not to question juror No. 91 was an exercise in discretionary judgment. *See State v. Goodwin*, 84 Ohio St.3d 331, 335, 703 N.E.2d 1251 (1999). Even assuming trial counsel were deficient, any "claim of prejudice is necessarily speculative, because we cannot know whether [this juror] *could* have been rehabilitated." (Emphasis sic.) *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 213. Thus, this ineffectiveness claim lacks merit.

2. *Failure to object to excusal for cause*

{¶ 232} Neyland argues that trial counsel were ineffective by failing to object to the trial court's excusal for cause of prospective juror No. 24, because that juror stated that she could vote to impose the death penalty even though she expressed reluctance to provide a blanket "yes" to cover all contingencies. But the record shows that trial counsel did object to the excusal of juror No. 24. We reject this ineffectiveness claim.

3. *Failure to prepare for mitigation*

{¶ 233} Neyland argues that his counsel were ineffective by failing to independently investigate his background or conduct any mitigation investigation. Neyland asserts that his counsel's only attempt at mitigation was to "recycle Dr. Sherman's testimony from the competency hearing" and request a presentence investigation ("PSI").

**{¶ 234}** An attorney's failure to reasonably investigate the defendant's background and present mitigating evidence to the jury at sentencing can constitute ineffective assistance of counsel. *Wiggins v. Smith*, 539 U.S. 510, 521-522, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). "Defense counsel has a duty to investigate the circumstances of his client's case and explore all matters relevant to the merits of the case and the penalty, including the defendant's background, education, employment record, mental and emotional stability and family relationships." *Goodwin v. Johnson*, 632 F.3d 301, 318 (6th Cir.2011). However, Neyland has the burden of demonstrating that his counsel rendered ineffective assistance by failing to conduct an adequate investigation. *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 104, citing *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674.

### a. *Background*

**{¶ 235}** Beginning on December 11, 2007 (more than ten months before trial), defense counsel informed the trial court that they wanted to "start preparing almost immediately" for mitigation. Counsel hired Kelly Heiby, a mitigation expert, Dr. Wayne J. Graves, a psychologist, and Beth Ann Crum, a defense investigator, to assist counsel in preparing for mitigation.

**{¶ 236}** During a pretrial hearing on July 28, 2008, defense counsel informed the trial court that Neyland "refused to cooperate in any preparation" for mitigation. Neyland refused to meet with either Dr. Graves or Heiby. However, defense counsel said that they would continue trying to convince Neyland to cooperate with them. During a pretrial hearing on August 5, 2008, counsel notified the trial court that Neyland still refused to cooperate in preparing for mitigation.

**{¶ 237}** During a pretrial hearing on August 25, 2008, defense counsel told the court that Neyland refused to sign any releases to allow the defense to obtain any of his education, employment, military, medical, or court records.

Counsel asked the trial court to order that these records be released to them. The trial court granted the defense request except for Neyland's juvenile court records.

{¶ 238} On September 19, 2008, defense counsel filed a motion requesting the court to reconsider its finding that Neyland was competent. The defense motion was based, in part, on Neyland's refusal to cooperate with Dr. Graves and Heiby in preparing for mitigation. The motion included a letter from Heiby, stating that Neyland "gave me no viable information to assist me in doing a proper mitigation investigation." The motion also included Dr. Graves's affidavit stating that Neyland "expressed an absolute refusal to cooperate in any type of preparation of mitigation for trial" and "refused to cooperate in any psychological testing."

{¶ 239} Following the state's presentation of trial-phase evidence, defense counsel stated that Neyland continued to refuse to cooperate in preparing for mitigation. Consequently, his counsel requested a PSI in the event that the jury found Neyland guilty of any of the capital specifications. Defense counsel expressed uncertainty about whether Neyland would cooperate in completing the PSI. But Adrian Cimerman, lead defense counsel, told the court that he and assistant defense counsel "are in possession of other information that we could pass on to the probation department in terms of employment history, family members who might be contacted for family background, [and] school records * * *."

{¶ 240} During mitigation, the defense presented Dr. Sherman's testimony, Neyland made two unsworn statements, and the PSI was presented for the jury's consideration.

b. *Analysis*

{¶ 241} Nothing in the record shows that defense counsel did not conduct an adequate investigation. Counsel obtained a mitigation specialist, a psychologist, and a defense investigator. Billing records show that Heiby spent

numerous hours conducting her investigation between July 17 and October 22, 2008. The record does not show the full extent of the defense investigation into mitigation, but the court "cannot infer a defense failure to investigate from a silent record." *Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, at ¶ 244.

### (1) Neyland's refusal to cooperate

{¶ 242} Neyland's refusal to cooperate with defense experts in preparing for mitigation thwarted defense efforts to obtain information that could be used on his behalf during mitigation. The state argues that Neyland's ineffectiveness claim should be rejected based on the invited-error doctrine, because his refusal to cooperate with counsel in preparing mitigation caused the error that he now asserts.

{¶ 243} Under the invited-error doctrine, a party is not entitled to take advantage of an error that he himself invited or induced *the trial court* to make. *State ex rel. Kline v. Carroll*, 96 Ohio St.3d 404, 2002-Ohio-4849, 775 N.E.2d 517, ¶ 27. Neyland's ineffectiveness claim is not trying to take advantage of an error that he induced the trial court to make. Thus, the invited-error doctrine does not apply.

{¶ 244} Nonetheless, Neyland's lack of cooperation in preparing for mitigation is an important factor in reviewing whether counsel was deficient. To determine whether counsel's performance was deficient, the court must measure it against an objective standard based on accepted professional norms. *See Rompilla v. Beard*, 545 U.S. 374, 380, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005).

{¶ 245} As a starting point, neither *Wiggins* nor *Strickland* addresses a situation where a defendant interferes with counsel's efforts to present mitigating evidence to a sentencing court. In *Rompilla*, the defendant refused to assist counsel in the development of a mitigation case, *id.* at 381, but there is no indication that the defendant ever informed the court that he did not want mitigating evidence presented. The Supreme Court held that counsel was

responsible for conducting a further investigation even though the defendant suggested that no mitigation was available. *Id*. at 381-389.

{¶ **246**} In *Schriro v. Landrigan*, 550 U.S. 465, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007), the defendant actively obstructed counsel's investigation and outright refused to allow counsel to present any mitigating evidence. For example, the defendant explicitly instructed his mother and ex-wife not to testify. *Id*. at 469. Counsel tried to make a proffer of the witnesses' testimony, but the defendant repeatedly interrupted his presentation to the court to reiterate that he did not want mitigating evidence presented. *Id*. at 470. The Supreme Court held that the defendant's refusal to cooperate in the penalty phase rendered counsel's limited investigation and presentation of mitigating evidence reasonable under the circumstances. *Id*. at 475-477.

{¶ **247**} In *Owens v. Guida*, 549 F.3d 399 (6th Cir.2008), the United States Court of Appeals for the Sixth Circuit considered whether counsel's failure to investigate a capital defendant's background was deficient when the defendant would not cooperate. In *Owens*, the defendant would not cooperate with mental-health examiners, would not allow counsel to communicate with her family, and contrary to counsel's advice, would not take the stand herself. *Id*. at 406-407. The court held that any failure to develop mitigating evidence was the result of the defendant's actions and not deficient performance by her counsel. *Id*. at 412. The court stated, "A defendant cannot be permitted to manufacture a winning [ineffective-assistance-of-counsel] claim by sabotaging her own defense, or else every defendant clever enough to thwart her own attorneys would be able to overturn her sentence on appeal." *Id*.

{¶ **248**} Other courts have held that a defendant's lack of cooperation does not eliminate counsel's duty to investigate. *See Hamilton v. Ayers*, 583 F.3d 1100, 1118 (9th Cir.2009); *Sonnier v. Quarterman*, 476 F.3d 349, 358 (5th Cir.2007). Moreover, the ABA Guidelines for the Appointment and Performance

of Defense Counsel in Death Penalty Cases (2003) provide, "The investigation regarding penalty should be conducted regardless of any statement by the client that evidence bearing upon penalty is not to be collected or presented." *Id.,* Guideline 10.7(A)(2), at 76. *See Bobby v. Van Hook*, 558 U.S. 4, 7, 130 S.Ct. 13, 175 L.Ed.2d 255 (2009) (ABA standards useful as "guides" to what reasonableness entails to the extent that they describe professional norms that prevailed when the representation took place).

{¶ 249} Neyland's refusal to cooperate appears to fall somewhere between *Rompilla* and *Landrigan*. Neyland refused to cooperate with the mitigation specialist and the defense psychologist in preparing mitigation. But Neyland never told the trial court that he did not want defense counsel to present mitigation. Neyland made two unsworn statements during the mitigation proceedings, which indicates that he did want to present some mitigation. We hold that Neyland's refusal to cooperate with the mitigation specialist and the defense psychologist did not excuse counsel from conducting a mitigation investigation.

(2) Mitigating information obtained

{¶ 250} Despite Neyland's lack of cooperation, the record shows that the defense was able to assemble and collect mitigating information. Trial counsel obtained a court order for Neyland's records after he refused to sign a release. Trial counsel also had ample information about Neyland's mental condition from the competency proceedings that could be used for mitigation purposes after Neyland refused to cooperate with Dr. Graves and would not undergo any further psychological testing. Indeed, Dr. Sherman testified during mitigation. The PSI also shows that a wealth of information was obtained about Neyland's family history, educational background, employment history, military service, and lack of a serious criminal record.

{¶ 251} Finally, Neyland's generalized claim fails to specify any mitigating information that his counsel failed to obtain. Thus, we hold that Neyland has failed to establish that defense counsel performed inadequately in preparing for mitigation. *See Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, at ¶ 71; *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 226.

4. *Other ineffective-assistance allegations*

{¶ 252} Neyland raises other instances of alleged ineffective assistance of counsel. As discussed in other propositions of law, trial counsel did object to the trial court's order that Neyland wear a leg restraint, and counsel's failure to object to the second leg restraint was not prejudicial (proposition of law III). Counsel were also not ineffective by failing to file motions to suppress his statements to police and the evidence obtained from a search of his motel room (proposition of law VII).

{¶ 253} As to other alleged instances of ineffective assistance of counsel, even if we assume that counsel were deficient, no prejudice resulted. Neyland was not prejudiced by counsel's failure to object to the prosecutor's opening statement and closing argument during the penalty phase (proposition of law VI), and he was also not prejudiced by counsel's failure to object to penalty-phase instructions (proposition of law IX). Neyland also objects to other alleged instances of substandard lawyering but fails to provide any specific examples in support of this allegation. We also reject this claim.

{¶ 254} Based on the foregoing, we overrule proposition V.

5. *Failure to preserve the record*

{¶ 255} In proposition of law XIX, Neyland argues that his counsel were ineffective by failing to make timely objections and preserve meritorious issues for appellate review. Yet Neyland does not cite any record references, any objections that counsel failed to make, or any meritorious issues that counsel

failed to preserve. Thus, Neyland has failed to establish deficient performance or prejudice. *See Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, at ¶ 197. We reject proposition XIX.

D. *Remaining issues*

1. *Cumulative error* (Proposition of law XVIII)

{¶ 256} Neyland argues that cumulative errors committed during the trial deprived him of a fair trial and require a reversal of his convictions and death sentence.

{¶ 257} *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus, recognized the doctrine of cumulative error. Under this doctrine, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial, even though each of the numerous errors does not individually constitute cause for reversal. *Id*. at 196-197. *See also Powell* at ¶ 222-224; *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995).

{¶ 258} The doctrine of cumulative error is not applicable in the present case. Neyland received a fair trial. Moreover, none of the errors committed in this case, when considered either individually or cumulatively, resulted in prejudicial error. As previously discussed in other propositions of law, overwhelming evidence was introduced that established Neyland's guilt. Proposition XVIII is overruled.

2. *Proportionality* (Proposition of law X)

{¶ 259} Neyland argues that Ohio's proportionality review is unconstitutional. He contends that a meaningful proportionality review must include cases resulting in life imprisonment after a capital-sentencing hearing, as well as those resulting in the imposition of the death penalty. However, we have consistently held that the proportionality review required by R.C. 2929.05(A) is satisfied by a review of cases in which the death penalty has been imposed. *See*

*State v. Scott*, 101 Ohio St.3d 31, 2004-Ohio-10, 800 N.E.2d 1133, ¶ 51; *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 23; *Steffen*, 31 Ohio St.3d 111, 509 N.E.2d 383, at paragraph one of the syllabus. Proposition X is overruled.

3. *Constitutionality of death penalty* (Proposition of law XVII)

{¶ 260} Neyland challenges the constitutionality of Ohio's death-penalty statutes. These claims can be rejected. *See State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, ¶ 215-216; *State v. Carter*, 89 Ohio St.3d 593, 607, 734 N.E.2d 345 (2000); *State v. Jenkins*, 15 Ohio St.3d 164, 473 N.E.2d 264 (1984), paragraph one of the syllabus.

{¶ 261} In addition, Neyland claims that Ohio's death-penalty statutes violate international law and treaties to which the United States is a party. This argument also lacks merit. *See State v. Issa*, 93 Ohio St.3d 49, 69, 752 N.E.2d 904 (2001); *Phillips*, 74 Ohio St.3d at 103-104, 656 N.E.2d 643.

4. *Lethal injection* (Proposition of law VIII)

{¶ 262} Neyland challenges the constitutionality of lethal injection. However, this court has previously rejected similar claims. *See Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, at ¶ 131; *Carter* at 608.

5. *Appropriateness of death sentence* (Proposition XVI)

{¶ 263} Neyland argues that the death penalty is not appropriate because of evidence of his mental condition and/or mental illness. We shall consider these arguments during our independent sentence evaluation.

## IV. Independent Sentence Evaluation

{¶ 264} Having considered Neyland's propositions of law, this court must now independently review Neyland's death sentence for appropriateness and proportionality and independently determine whether the aggravating circumstance of which Neyland was convicted outweighs the mitigating factors pursuant to R.C. 2929.05(A).

A. *Aggravating circumstance*

{¶ 265} Neyland was convicted of murdering Thomas Lazar and Douglas Smith as part of a course of conduct involving the purposeful killing of two or more persons in violation of R.C. 2929.04(A)(5). The evidence at trial supports the jury's finding of this aggravating circumstance.

{¶ 266} The evidence established that Neyland arrived at Liberty Transportation to meet with Lazar and Smith about the termination of his employment. After arriving at Liberty, Neyland shot and killed Lazar in the parking-lot area and then went to Smith's office and killed him. Neyland fled to a Michigan motel, where he was later captured. A handgun found in Neyland's tractor was later identified as the murder weapon.

{¶ 267} Here, the killing of both victims was directly linked in time and location. *See State v. Sapp*, 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239, ¶ 52 (time, location, and murder weapon can establish the factual link necessary to prove a course of conduct).

{¶ 268} The evidence also establishes that Neyland's acts were purposeful. Neyland shot Lazar four times in the back and shot Smith in the head. Moreover, Neyland told another truck driver about a week before the murders, "If they mess with me, I'll just shoot them." The 9-1-1 tape also captured Neyland telling Smith to "crawl bitch" before killing him. Finally, the coroner's testimony established that three of the gunshot wounds on Lazar's back were in close proximity and displayed a triangular pattern. Following Neyland's arrest, pieces of paper that Neyland had left were found in his storage unit. One piece displayed three pennies arranged in a close triangular pattern that matched the gunshot pattern on Lazar's back. The paper contained the words, "OOOO, I'm so scared. Three Round Shot Group." There was also the statement, "You think I'm playing[.] You're going to come up missing!!!"

B. *Mitigating evidence*

{¶ 269} Against this aggravating circumstance, this court must weigh the mitigating factors contained in R.C. 2929.04(B). Neyland called Dr. Thomas Sherman as a witness. Neyland also made an unsworn statement, a supplemental unsworn statement, and a statement in allocution. In addition, Neyland introduced a PSI and the record of his behavior in jail.

{¶ 270} Dr. Sherman evaluated Neyland during the competency proceedings. Dr. Sherman testified that Neyland was paranoid. Dr. Sherman stated that it was very obvious in talking with Neyland that "the normal process of reason and logic weren't there." He stated that "it was crystal clear to me that he had a mental illness, and I thought he was incompetent to stand trial." Dr. Sherman made two diagnoses: "One is a delusional disorder, a persecutory type. And the second is schizophrenia, a more severe form of that illness."

{¶ 271} Dr. Sherman provided examples of Neyland's behavior that supported his findings. First, Neyland moved out of his house and into his truck because he believed that people were breaking into his house to listen to his answering machine. Second, Neyland mentioned that prophylactics were mysteriously showing up all the time in his laundry. Finally, Neyland placed notes in his storage unit saying, "I'm so scared" and left other comments relating to the shooting.

{¶ 272} Dr. Sherman testified that Neyland met the criteria for the R.C. 2929.03(B)(3) mitigating factor. Dr. Sherman stated:

> [Neyland] was laboring under severe mental disease, mental illness. As I mentioned earlier, there is no way he could formulate conclusions in a normal way. As I indicated, all of this indicates to me he had a severe mental illness of a paranoid type, that he suspected virtually everybody of something, that probably

would have not taken very much to tip him off. And I have no idea what exactly it was about his relationship with these two people, but the intensity of the reaction was compatible with all of the things I mentioned earlier. You don't do something like this because you've got a grudge against two people.

**{¶ 273}** The PSI included a variety of information about Neyland's background. Neyland was 43 years old at the time of the offenses. He has never been married and has no children. Neyland was born in Toledo and was one of ten siblings. Neyland's father was a minister and "worked in the pathology field," and his mother was a registered nurse. Neyland's parents divorced when he was 14 years old. Neyland and his siblings remained in their mother's custody after the divorce.

**{¶ 274}** Neyland reported that his mother was strict, and Neyland's family life was heavily influenced by his mother's involvement in church. Neyland later went to live with an uncle and then lived with his father in Michigan. Neyland denied any familial history of mental illness and stated that neither of his parents had a chemical-dependency problem. Neyland's father died in 1997, and his mother died in 2006.

**{¶ 275}** Neyland attended Toledo schools for most of his education. He graduated from Scott High School in June 1982. He ranked 182nd out of a class of 246 students. His grade point average was 1.23 on a 4.00 scale.

**{¶ 276}** Neyland served in the Army from March 1987 to May 1988. Military records showed that he was charged with desertion and later received a discharge "for the good of the service."

**{¶ 277}** Neyland reported that he graduated from American Truck Driving School in 1988. Neyland has worked as a truck driver for numerous trucking companies. He was hired as a truck driver for Liberty Transportation in July

2006. As a driver for Liberty, Neyland committed traffic violations and violated company policy on several occasions.

{¶ 278} Neyland does not have a significant criminal record. He was convicted of bad-check offenses in 1987. Otherwise, Neyland's record shows a history of traffic violations for speeding and other minor driving offenses. Neyland denied using any illicit substances, but he has occasionally used alcohol.

{¶ 279} A report from the Wood County Sheriff's Office was introduced and provided a daily account of Neyland's behavior while he was in jail awaiting trial. The report shows that Neyland followed procedures and behaved himself except for a couple of minor incidents.

{¶ 280} In his unsworn statement, Neyland said that while he was jailed at the Wood County Justice Center, other inmates called him "Osama Bin Ladin." Neyland is not a Muslim. He is a Christian, and his father pastored two churches.

{¶ 281} Neyland is the third oldest of ten children. He was born and raised in Toledo. Neyland's father prepared tissue samples for examination by doctors and surgeons. His mother was a registered nurse. Neyland has never had any children. But he has had "two paternity tests" against him. A case from Kansas was dismissed in Ohio. Neyland wanted that placed into the record so that there would be no questions about any nonpayment of child support.

{¶ 282} Neyland has worked as "a driver for 20 years off and on." Before that, Neyland was in the military and worked with the military police.

{¶ 283} Neyland also stated, "I'm going to read into the record a statement * * * because I really do believe that the case was not presented in its full totality." Neyland said:

> In order for the scales of justice to remain balanced, all [of the] Court's findings, in parenthesis, decisions, must be based on the rule of law, not on motions, underlined, all cases are subject to

judicial review. This is a murder trial. All evidence must be presented, the evidence that in all probability will convict the defendant and evidence that could possibly exonerate the defendant. Neither the prosecution nor the defense presented the evidence in its totality during these court proceedings.

{¶ 284} Neyland then told the jury about court cases that he had been involved in so that "you would have some idea of what type of person I am." The first case was an action involving Ohio Job and Family Services, in which he was "awarded $7,500 for the year of unemployment that I was previously denied." The second case occurred in Indiana, and he was awarded reimbursement of a week's wages that had been withheld from him.

{¶ 285} Neyland presented a supplemental unsworn statement after Dr. Sherman testified. Neyland said that he wanted to question Dr. Sherman but the judge would not allow it. Neyland wanted Dr. Sherman to observe him while he made a statement to the court and then tell the court what he witnessed. Neyland disputed Dr. Sherman's findings:

First of all, a psychotic person does not have a train of thought. * * *

I made $175,000 in 12 months. I have tax forms to prove it. From July the 1st of 2006 to January or December 31st of 2006, I made $85,558. A psychotic person doesn't have that memory, wouldn't be able to remember the numbers.

{¶ 286} Neyland then provided examples of his work as a truck driver and mentioned the time and effort that were required to perform those jobs. He stated, "I'm trying to make a point that a psychotic person would not be able to

accomplish that nor would they be able to remember it nor would they be able to plan that." Neyland also said: "I was a trainer for Gunther's, which means I train other drivers. Trucking companies would not allow drivers to train other drivers if they're psychotic. It is a requirement by DOT that drivers never have at any time * * * mental illness. So from 1999 to 2008 I was a driver."

{¶ 287} Neyland also disputed the sufficiency of the evidence of his guilt. He stated that Smith did not mention Neyland's name in making the 9-1-1 call. Neyland also said that his clothes did not have any blood spatters on them and were not tested for gunpowder residue. He also stated, "The jury was not presented with Douglas Smith's hands, with what seemed to be blond hair wrapped around his fingers. * * * I don't have blond hair. * * * I have an afro, I have curly hair."

{¶ 288} The state called Dr. Bergman, Dr. Kristen Haskins, and Dr. Delaney Smith as rebuttal witnesses. These witnesses had also evaluated Neyland during the competency proceedings.

{¶ 289} Dr. Bergman, a psychologist, testified that Neyland was not suffering from a mental illness but had a severe personality disorder. Dr. Bergman stated that she could not determine whether Neyland lacked substantial capacity to appreciate the criminality of his conduct because Neyland would not talk to her about his criminal conduct.

{¶ 290} Dr. Haskins, a psychologist, testified that Neyland had a "mixed personality disorder." She stated, "[H]e's capable of choosing his behaviors and actions and of making decisions. And there were no indications that those were tainted by any kind of severe mental illness."

{¶ 291} Dr. Smith, a psychiatrist, detected no signs of mental illness, but determined that Neyland had a paranoid personality disorder. Dr. Smith had reviewed Dr. Sherman's report and stated that she had "more time to observe and

interact with Mr. Neyland and see him in various different settings and see his interactions with different people."

{¶ 292} Before sentencing, Neyland made a statement in allocution. Neyland discussed his background. He had a paper route with the Toledo Blade and also worked as a crew chief for McDonald's when he was growing up. Neyland stated that he did "not [have] a lot friends, not a lot of girlfriends, no children."

{¶ 293} Neyland said, "All the males in my family from the Civil War to World War II, [and] Korea" served in the military. Neyland is a veteran and entered the military two weeks after graduating from high school. Neyland said, "All of the jobs that I've ever had, and that includes military jobs, I was given responsibility." He continued, "I've always operated on my own, and I've made my own decisions. And this is how my dad raised me."

{¶ 294} Neyland discussed the offenses. He stated that he did not know Doug Smith personally and had never met Lazar. Neyland also said:

> I sat here and I watched the jurors during the whole proceedings. And I am not sure from observing them that they are aware of the total idea or the total realm, if you put everything together, what actually happened.
>
> I cannot say that I know what happened August the 8th. But I can tell you from facts that Douglas Smith and Tomm Lazar are not here to take responsibility for what they did prior to August the 8th and what led to August 8th.
>
>    * * *
>
> Just watching the jury, they did not listen to the whole case. What did they come up with? Death. They cannot place me at Liberty Transportation at 7171 Reuthinger Road. The law

enforcement in the State of Ohio did not see me. They did not see my tractor. Law enforcement in Michigan at the time of the phone call at 2:58 p.m., from 3 p.m. to 3:30 p.m., Chief Hines of Erie Township Police Department viewed or saw the truck with Officer Konopka. The jury did not hear that. They did not want to hear that. I don't have a time machine. I could not possibly be in two places at once.

* * *

* * * I don't live my life in fear and I fear no man. But I will tell you what my dad told me. "Vengeance is mine sayeth the Lord, and that is the double-edged sword." That's all I have to say, Your Honor.

## C. *Sentence evaluation*

{¶ 295} Nothing in the nature and circumstances of the offenses appears to be mitigating. Neyland shot and killed two officials at Liberty Transportation who were about to fire him. Neyland left notes in his storage unit before the shootings occurred that indicated his intent to carry out these offenses. These offenses establish horrific crimes that lack any mitigating features.

{¶ 296} Neyland's character offers little in mitigation. His history and background also provide little mitigating value. Neyland grew up in a large family with supportive parents. He was a high school graduate and served in the Army. Neyland was also gainfully employed as a truck driver for many years and supported himself with a good income.

{¶ 297} The statutory mitigating factors under R.C. 2929.04(B) include (B)(1) (victim inducement), (B)(2) (duress, coercion, or strong provocation), (B)(3) (mental disease or defect), (B)(4) (youth of the offender—Neyland was 43 at the time of the offense), (B)(5) (lack of a significant criminal record), (B)(6)

(not the principal offender), and (B)(7) (any other relevant factors). The factors under (B)(1), (B)(2), (B)(4), and (B)(6) do not appear to apply.

{¶ 298} Dr. Sherman testified that the R.C. 2929.04(B)(3) mitigating factor applies. The (B)(3) factor applies when "at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law." But two psychologists and another psychiatrist testified that Neyland suffered from a personality disorder rather than a mental illness. A behavior or personality disorder does not qualify as a mental defect or disease. *See State v. Fox*, 69 Ohio St.3d 183, 192, 631 N.E.2d 124 (1994); *State v. Richey*, 64 Ohio St.3d 353, 372, 595 N.E.2d 915 (1992).

{¶ 299} In weighing their conflicting testimony about the applicability of the (B)(3) factor, we note that Dr. Sherman met with Neyland for approximately one hour in conducting his examination. In contrast, Dr. Haskins and Dr. Smith evaluated Neyland during a lengthy in-patient observation period. We conclude that the (B)(3) factor has not been established.

{¶ 300} However, we give significant weight to Neyland's personality disorders and other mental problems under the catch-all provision, R.C. 2929.04(B)(7). Undoubtedly, Neyland is paranoid. On several occasions, Neyland made bizarre comments that made little sense and exhibited other odd behavior during trial. Yet Dr. Haskins emphasized that Neyland was "capable of choosing his behaviors and actions and of making decisions. And there were no indications that those were tainted by any kind of severe mental illness."

{¶ 301} We also give weight to the R.C. 2929.04(B)(5) mitigating factor, because Neyland does not have a significant criminal record.

{¶ 302} In addition, we give weight to Neyland's employment history and his military service as a (B)(7) factor.

{¶ 303} Neyland claims that his good behavior in jail is a mitigating factor. Good behavior in jail is relevant to lack of future dangerousness: " '[T]he lack of a prison disciplinary record reveals nothing about a defendant's character except that the defendant can exist in the highly structured environment of a prison without endangering others.' " *Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, at ¶ 210, quoting *Franklin v. Lynaugh*, 487 U.S. 164, 186, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988) (O'Connor, J., concurring). Thus, we give weight to Neyland's good behavior while in pretrial confinement.

{¶ 304} Based upon our independent weighing of the evidence, we conclude that the aggravating circumstance as to each count outweighs all the mitigating factors beyond a reasonable doubt. Neyland's course of conduct in killing Lazar and Smith is a grave aggravating circumstance. Neyland's mitigating evidence pales in comparison. We also note that Neyland shows no remorse for what happened and does not accept responsibility for his actions.

{¶ 305} As a final matter, we find that the penalty imposed in this case is not "excessive or disproportionate to the penalty imposed in similar cases" of murder as a course of conduct involving the purposeful killing of two or more persons. R.C. 2929.05(A). *See State v. Clemons*, 82 Ohio St.3d 438, 696 N.E.2d 1009 (1998) (truck driver went to office of employer and murdered three co-workers); *State v. Davie*, 80 Ohio St.3d 311, 686 N.E.2d 245 (1997) (former employee killed two former co-workers and attempted to kill a third).

## V. Conclusion

{¶ 306} We affirm the judgments of conviction and the sentence of death.

Judgment affirmed.

O'CONNOR, C.J., and O'DONNELL, LANZINGER, and FRENCH, JJ., concur.

PFEIFER, J., concurs in part and dissents in part.

O'NEILL, J., dissents.

——————————

**PFEIFER, J., concurring in part and dissenting in part.**

{¶ 307} I concur in the finding of guilt. There is no reasonable doubt about whether Neyland committed the murders in this case. Based on my independent weighing of the aggravating factors and the mitigating factors, primarily his mental health at the time the murders were committed, I conclude that Neyland should not be put to death. I would vacate the sentence of death and remand to the trial court under R.C. 2929.06 for a resentencing hearing in which the death penalty is not an option.

_____

**O'NEILL, J., dissenting.**

{¶ 308} Something is terribly wrong with Ohio's application of the death penalty, and it does not seem to be getting any better with the passage of time. In 1994, Wilford Berry Jr.—commonly known as "the Volunteer"—began doing everything he could to speed up the implementation of his death sentence. Berry was convicted in 1990 of the aggravated murder of Charles Mitroff, and even then it was clear that Berry had struggled with mental illness all his life, including personality disorders. *State v. Berry*, 72 Ohio St.3d 354, 650 N.E.2d 433 (1995). But Berry was found to be competent to waive his appeals, and on February 19, 1999, he was executed—the first person executed in Ohio in over 30 years.

{¶ 309} Seven years later, despite Donald Ketterer's lifelong psychiatric problems (including bipolar disorder and personality disorders), this court concluded that he was competent to plead guilty to aggravated murder, and we affirmed his sentence of death. *State v. Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48. In a concurring opinion, two justices of this court expressed their belief that the state should "reexamine whether we, as a society, should administer the death penalty to a person with a serious mental illness." *Id.* at ¶ 213 (Lundberg-Stratton, J., concurring, and Pfeifer, J., joining the concurrence). Thus far, no such reexamination has occurred.

**{¶ 310}** I have previously stated that the death penalty is both cruel and unusual and cannot be morally justified by retribution or deterrence. *State v. Wogenstahl*, 134 Ohio St.3d 1437, 2013-Ohio-164, 981 N.E.2d 900 (O'Neill, J., dissenting). But the unconstitutionality and inhumanity of capital punishment are even clearer when it is imposed on the mentally ill, such as Calvin Neyland. It is plain that the families of Douglas Smith and Thomas Lazar have suffered tremendously at Neyland's hands, and they deserve to see Neyland punished. But I cannot support the proposition that it is a just punishment to take the life of a man whose delusions of persecution led him to commit the horrible acts for which he was convicted.

**{¶ 311}** The majority has concluded that Neyland had not established the statutory mitigating factor under R.C. 2929.04(B)(3) that "at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to * * * conform the offender's conduct to the requirements of the law." This conclusion is baffling. The experts who testified at Neyland's trial all agreed that Neyland suffered from significant mental problems that affected his behavior: Dr. Bergman concluded that Neyland had a severe personality disorder, Dr. Haskins concluded that Neyland had a mixed personality disorder, and Dr. Smith testified that Neyland had a paranoid personality disorder. And the defendant's expert, Dr. Sherman, diagnosed Neyland with "delusional disorder, a persecutory type" and schizophrenia. Dr. Sherman concluded that Neyland, to a reasonable degree of scientific certainty, "was laboring under severe mental disease, mental illness * * * [and that] there is no way he could formulate conclusions in a normal way."

**{¶ 312}** Neyland's mental illness was apparent as far back as 1999, when he simply fell through the cracks in the system. At the time he killed Douglas Smith and Thomas Lazar, Neyland was living in his truck because he believed that people were breaking into his house to listen to the messages on his

answering machine. As Dr. Sherman observed, at the time he committed the murders, Neyland suffered from "a severe mental illness of a paranoid type, that he suspected virtually everybody of something, [and] that [it] probably would have not taken very much to tip him off." Neyland was and is very resistant to treatment, and this is most effectively demonstrated by his refusal to participate in developing a mitigation case. He then offered a statement in rebuttal to the diagnosis of his own defense expert, further evidencing his denial and delusions. A mentally competent person simply does not challenge the findings of a defense expert who has been hired with the sole objective of saving that person's life.

{¶ 313} It is plain that Neyland is not now mentally fit and that he was suffering from mental defects at the time he committed his terrible acts. As former governor Michael DiSalle recognized in 1959 when he commuted the sentence of Lewis Niday, "[s]urely society [does] not need to take the life of a mentally defective individual in order to protect itself."[3] Capital punishment in general is abhorrent, but executing the mentally ill is unconscionable. I dissent.

—————————————

Paul A. Dobson, Wood County Prosecuting Attorney, and Gwen Howe-Gebers and Heather M. Baker, Assistant Prosecuting Attorneys, for appellee.

Spiros P. Cocoves and Ann M. Baronas, for appellant.

——————————————

---

[3] *Quoted in* Andrew Welsh-Huggins, *No Winners Here Tonight: Race, Politics and Geography in One of the Country's Busiest Death Penalty States¸* at 116 (2009).